SAM GOLDBERGER, INC., PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE

SAM GOLDBERGER, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3936-84, 20040-84.     Filed June 23, 1987.

*Frank R. Berman, James E. Kelly,* and *Scott G. Harris,* for the petitioners.

*David R. Smith,* for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in petitioners' Federal income taxes and additions to tax under section 6653(a)(1)[1] and (2) as follows:

| Docket No. | Taxable year ended | Deficiency | Additions to tax Sec. 6653(a)(1) | Sec. 6653(a)(2) |
|---|---|---|---|---|
| 3936-84 | 09/30/77 | $4,292.00 | - - - | - - - |
| | 09/30/78 | 11,149.00 | - - - | - - - |
| | 09/30/79 | 46,636.00 | $200.00 | - - - |
| | 09/30/82 | 1,411.00 | 71.00 | ([1]) |
| 20040-84 | 12/31/77 | 62,302.00 | 3,115.10 | - - - |
| | 12/31/80 | 27,248.01 | 1,362.40 | - - - |
| | 12/31/81 | 810.00 | 40.50 | ([2]) |

[1]50 percent of the interest due on $1,411.
[2]50 percent of the interest due on $810.

These cases were consolidated for trial, briefing, and opinion. After concessions, the issues for decision are: (1) Whether we have jurisdiction to decide if Sam Goldberger International, Inc., qualified as a Domestic International Sales Corporation for its taxable year ended October 31, 1979, and if we do, whether it so qualified; (2) whether Sam Goldberger, Inc., is entitled to a deduction for salary paid to Emma Sterner; (3) whether Sam Goldberger properly valued the ending inventory of meat products of his sole proprietorship; (4) whether the sole proprietorship of Sam Goldberger is entitled to deductions for rent; (5) whether the sole proprietorship of Sam Goldberger is entitled to a deduction for travel and entertainment expenses; (6) whether the proceeds from the sale of a cabin are includable in the gross income of Sam Goldberger; and (7) whether

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the relevant years, and all Rule references are to the Rules of Practice and Procedure of this Court.

petitioners are liable for the additions to tax under section 6653(a)(1) and (2).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits are incorporated by this reference.

Petitioner Sam Goldberger (Sam) resided in Miami, Florida, at the time he filed his petition in this case. He filed his Federal income tax returns for the taxable years 1977, 1980, and 1981 with the Internal Revenue Service Center in Chamblee, Georgia.

Petitioner Sam Goldberger, Inc. (Goldberger, Inc.), filed Federal income tax returns based upon a taxable year ended September 30, using the accrual method of accounting. Goldberger, Inc., filed Federal income tax returns for its taxable years ended September 30, 1977, through September 30, 1982, with the Internal Revenue Service Center in Ogden, Utah. We conclude that the principal office of Goldberger, Inc., was in Miami, Florida, at the time it filed its petition in this case.

During the taxable years in issue, Sam operated a meat brokerage business, as a sole proprietorship, under the name Sam Goldberger. Sam was also president and 100-percent shareholder of Goldberger, Inc., whose activities consisted of the brokerage and sale of meat products. Sam Goldberger International, Inc. (International), was a wholly owned subsidiary of Goldberger, Inc. It was involved in selling meat overseas, primarily to Japan. International elected Domestic International Sales Corporation (DISC) status on July 18, 1978, and filed a Form 1120-DISC, Domestic International Sales Corporation Return, for the period July 18, 1978, through October 31, 1978. It also filed a Form 1120-DISC for its taxable year ended October 31, 1979.

In 1972, Sam met Emma Sterner (Emma), who was working as a nurse at Miami Heart Institute, where he was a patient. In 1973, he hired Emma to be his nurse and secretary. She had been a secretary for 21 years before becoming a nurse in 1972. Emma administers medication and injections to Sam daily, and also provides foot care and leg therapy for him. With respect to the sole proprietorship

and Goldberger, Inc.,. she answers the telephone, opens the mail, prepares the paperwork for purchases and sales of meat, picks up meat samples at the airport, picks up individuals at the airport who are in town for business meetings with Sam, and attends the meetings. In addition, she makes airline and hotel reservations and accompanies Sam on all of his trips. During the taxable years ended September 30, 1980, through September 30, 1982, Goldberger, Inc., paid Emma wages of $9,000 per year and deducted the salary on its Federal income tax returns.

In 1978, Sam moved the offices of his sole proprietorship and Goldberger, Inc., to the personal residence of Emma at 5195 S.W. 64th Avenue, Miami, Florida. During the taxable years in issue, there was a telephone listing at this address for the sole proprietorship and Goldberger, Inc. Approximately one-third of the house was used in the business of the sole proprietorship and Goldberger, Inc.; a portion of the main living area or "Florida" room contained his desk and supplies, and an alcove off of the bedroom was used as an office. Sam also conducted business meetings at the house. A meat freezer was moved to the house in which meat samples were kept. In January 1980, Sam moved into the house and maintained it as both an office and his residence. Rent of $2,500 and $6,500 was paid to Emma for the taxable years 1980 and 1981, respectively, and Sam deducted the rent on his Federal income tax returns as an expense of his sole proprietorship. Although Sam deducted the rent as an expense of his sole proprietorship, the rent payments for the taxable year 1980 were made pursuant to a lease between Emma and Goldberger, Inc. The lease was for a 3-year term, commencing on November 1, 1977, and ending on October 30, 1980.

Sam made all decisions concerning the valuation of the inventory of meat products held by the sole proprietorship. He valued the inventory using the lower of cost or market method for the taxable years 1980 and 1981. He valued the ending inventory on December 31, 1980, as follows:

| Purchase date | Item | Lot number | Number of boxes | Purchase price per pound | Valuation[2] per pound |
|---|---|---|---|---|---|
| 01/08/80 | Pastrami | 3770 | 94 | $0.95 | $0.50 |
| 01/16/80 | Pastrami | 1891 | 501 | 0.95 | 0.50 |
| 01/16/80 | Pastrami | 1904 | 650 | 0.95 | 0.50 |
| 01/21/80 | Pastrami | 1970 | 441 | 0.95 | 0.50 |
| 03/13/80 | Pastrami | 71314 | 254 | 0.99 | 0.50 |
| 04/22/80 | Pastrami | 0200 | 40 | 0.825 | 0.50 |
| 06/28/80 | Pastrami | 3652 | 66 | 0.92 | 0.70 |
| 08/08/80 | Pastrami | 3629 | 550 | 0.92 | 0.70 |
| 09/25/80 | Pastrami | 4616 | 497 | 0.92 | 0.70 |
| 10/17/80 | Pastrami | 4846 | 273 | 0.95 | 0.70 |
| 10/21/80 | Shank meat | 7812 | 655 | 1.16 | 1.00 |
| 10/21/80 | 90-percent trim | 7813 | 74 | 1.16 | 1.00 |
| 11/26/80 | Back Rib | 8034A | 76 | 0.55 | 0.55 |
| 11/26/80 | Back Rib | 8076A | 474 | 0.55 | 0.55 |
| 12/05/80 | Shank Meat | 8757 | 679 | 1.15 | 1.00 |
| 12/22/80 | Briskets | 8572 | 475 | 1.20 | 1.20 |
| 1980 | Shank Meat | 6787 | 17 | 1.00 | 0 |

Lot 1904 and 37 boxes of lot 1970 (37,984 pounds) were sold on January 9, 1981. The sale was originally for 70 cents per pound; however, actual payment was only 50 cents per pound. Lots 8034A and 8076A (38,688 pounds) were sold on January 15, 1981, for 58 cents per pound.

Sam valued the ending inventory of meat products of his sole proprietorship on December 31, 1981, as follows:

| Purchase date | Item | Lot number | Number of boxes | Purchase price per pound | Valuation[2] per pound |
|---|---|---|---|---|---|
| 02/11/80 | Pastrami | 55904 | 227 | $1.14 | $0.285 |
| 02/25/80 | Pastrami | 56056 | 125 | 1.14 | 0.285 |
| 03/13/80 | Pastrami | 71314 | 254 | 0.99 | 0 |
| 04/22/80 | Pastrami | 0200 | 40 | 0.825 | 0 |
| 08/08/80 | Pastrami | 3629 | 56 | 0.92 | 0.175 |
| 10/18/80 | Pastrami | 4846 | 273 | 0.95 | 0.175 |
| 12/22/80 | Briskets | 8572 | 475 | 1.20 | 0.30 |
| 01/02/81[3] | Pastrami | 1891 1970 | 541 | 0.95 | 0.95 |
| 01/19/81 | Pastrami | 0417 | 660 | 0.94 | 0.94 |
| 02/25/81 | Pastrami | 2890 | 243 | 0.94 | 0.94 |
| 04/13/81 | C&C insides | | 553 | 1.52 | 1.52 |

Lot 8572 was sold in February 1982, and lots 0200, 0417, 71314, 3629, and 4846 were sold in March 1982.

---

[2]The reduction in the value of ending inventory increased the cost of goods sold, thereby decreasing the income of the sole proprietorship.

[3]Ending inventory for the taxable year 1980 shows that lot 1891 was purchased on Jan. 16, 1980, and lot 1970 was purchased on Jan. 21, 1980.

Sam deducted $17,266 of travel and entertainment expenses on his Federal income tax return for the taxable year 1981 as expenses of his sole proprietorship. However, he did not maintain a contemporaneous record of travel and entertainment expenses. He did not keep an account book, diary, or statement of expenses that set forth the specific purpose of any travel or entertainment expense.

During 1981, Sam sold a cabin which had been situated on land that he owned in Luck, Wisconsin. On his Federal income tax return for the taxable year 1981, he did not report the proceeds from the sale as income.

On March 16, 1983, the Commissioner mailed a statutory notice of deficiency to Goldberger, Inc., for its taxable year ended September 30, 1979. The Commissioner reallocated to Goldberger, Inc., the income of International for its taxable year ended October 31, 1979, under section 482, because he determined that International did not qualify as a DISC under sections 992(a) and 993(b) for its taxable year ended October 31, 1979.

On October 31, 1979, the assets of International were as follows:

| | |
|---|---:|
| Cash | $17,992 |
| Advances to Goldberger, Inc | 81,354 |
| Advances to others | 1,600 |
| | 100,946 |

The advances to Goldberger, Inc., were to be used to purchase merchandise to be sold by International. International did not have any credit in its own name; however, Goldberger, Inc., had a line of credit with Iowa Beef Processors, Inc., International's meat supplier. Iowa Beef Processors, Inc., discontinued supplying meat to International as of March 31, 1979. Sam tried for more than a year to replace the source of supply but was unsuccessful. The advances to Goldberger, Inc., were not repaid within the following year.

On September 26, 1983, Goldberger, Inc., filed a Form 1120X, Amended U.S. Corporation Income Tax Return, for the taxable year ended September 30, 1979, showing a refund equal to the amount determined as a deficiency on

the statutory notice of deficiency dated March 16, 1983.[4] On Form 1120X, Goldberger, Inc., stated as follows:

The IRS has disqualified the DISC status of Sam Goldberger, Inc. International and has attributed to the income of Sam Goldberger, Inc. gross DISC receipts of $7,014. The IRS disqualified the DISC because it determined that the DISC had accumulated an unreasonable amount of working capital. It is the position of the taxpayer that the determination of the reasonableness of the amount of working capital should be based upon the ordinary operating expenses during a current normal operating cycle of a DISC, not an abnormal operating cycle.

On December 9, 1983, the Commissioner mailed another statutory notice of deficiency to Goldberger, Inc., for the taxable years ended September 30, 1977, 1978, 1979, and 1982. The adjustments in the notice of deficiency reduced or eliminated the net operating losses incurred for the taxable years ended September 30, 1980, 1981, and 1982, that were carried back to the taxable years ended September 30, 1977, 1978, and 1979. The Commissioner made adjustments for the disqualification of International as a DISC for its taxable year ended October 31, 1979. The adjustments were explained as follows:

*Disqualification Distributions*

Sam Goldberger International, Incorporated, your subsidiary, was determined not to qualify as a D.I.S.C. Corporation for its fiscal year ending October 31, 1979. The disqualification distribution is a mandatory carry through adjustment due to the D.I.S.C. disqualification. This adjustment was made to the returns filed for the fiscal years ending September 30, 1981 and 1982, * * *

The Commissioner also disallowed the deductions claimed by Goldberger, Inc., for salary paid to Emma. In addition, the Commissioner determined that Goldberger, Inc., was liable for additions to tax under section 6653(a)(1) and (2).

On April 6, 1984, the Commissioner mailed a statutory notice of deficiency to Sam for the taxable years 1977, 1980, and 1981. The Commissioner disallowed the writedown of the meat products inventory, the rent deductions, all but $596.83 of the amount deducted for travel and entertainment expenses, and included in income the proceeds attributable to the sale of the cabin. The adjustments eliminated

---

[4]Goldberger, Inc., had a net operating loss for the taxable year ended Sept. 30, 1982, which was carried back and eliminated the deficiency.

the net operating loss incurred for the taxable year 1980 that was carried back to the taxable year 1977, thereby also creating a deficiency for the taxable year 1977. The Commissioner also determined that Sam was liable for additions to tax under section 6653(a)(1) and (2).

## OPINION

### *Domestic International Sales Corporation*

The Commissioner previously determined that International did not qualify as a DISC for its taxable year ended October 31, 1979.[5] Goldberger, Inc., asserts that the statutory notice of deficiency mailed on December 9, 1983, fails to give us jurisdiction to examine the adjustments made as a result of the previous determination of the Commissioner. Goldberger, Inc., reasons that the adjustments deal with the income of International and, therefore, a statutory notice of deficiency should have been sent to International.

In the notice of deficiency, the Commissioner made adjustments under section 995(b)(2)[6] to the net operating losses incurred for the taxable years ended September 30, 1981 and 1982. The adjustments dealt with the income of International accumulated during the taxable year ended October 31, 1978, the period it qualified as a DISC. The adjustments did not deal with income earned by International for a taxable year in which it was determined to not qualify as a DISC.

---

[5]On Mar. 16, 1983, the Commissioner mailed a statutory notice of deficiency to Goldberger, Inc., for its taxable year ended Sept. 30, 1979. The Commissioner made an adjustment that resulted from the determination that International did not qualify as a DISC for its taxable year ended Oct. 31, 1979. Goldberger, Inc., did not petition this Court for a redetermination of the deficiency.

[6]Sec. 995(b)(2) provides:

(2) DISTRIBUTIONS UPON DISQUALIFICATION.—

(A) A shareholder of a corporation which revoked its election to be treated as a DISC or failed to satisfy the conditions of section 992(a)(1) for a taxable year shall be deemed to have received (at the time specified in subparagraph (B)) a distribution taxable as a dividend equal to his pro rata share of the DISC income of such corporation accumulated during the immediately preceding consecutive taxable years for which the corporation was a DISC.

(B) Distributions described in subparagraph (A) shall be deemed to be received in equal installments on the last day of each of the 10 taxable years of the corporation following the year of the termination or disqualification described in subparagraph (A) (but in no case over more than twice the number of immediately preceding consecutive taxable years during which the corporation was a DISC).

Sections 6212(a) and 6213(a) and (c) require that notice be given to the "taxpayer" of the determined deficiency in taxes imposed by subtitle A (income tax) or B (estate and gift tax) or other miscellaneous chapters as a prerequisite, except under exceptional circumstances, to the assessment of a deficiency. However, section 991 provides that a DISC shall not be subject to the taxes imposed by subtitle A except for the taxes imposed by chapter 5 (sections 1491 through 1494) on certain transfers to avoid tax. A DISC still remains liable for other taxes, for example, social security taxes payable with respect to its employees under section 3111. Sec. 1.991-1(a), Income Tax Regs.

Sections 6212(a) and 6213(a) and (c) do not define the term "taxpayer." Section 7701(a)(14) provides that, unless "otherwise distinctly expressed or manifestly incompatible with the intent thereof * * * 'taxpayer' means any person subject to any internal revenue tax." Were we to apply literally the definition of taxpayer in section 7701(a)(14) to sections 6212(a) and 6213(a) and (c), without regard to the purpose Congress intended them to serve, it would follow that International was a "taxpayer," since its DISC status did not exempt it from every "internal revenue tax."

By virtue of the DISC status of International, Goldberger, Inc., became liable for the taxes on the income of International. Sec. 995(a).[7] As such, Goldberger, Inc., was a taxpayer in its own right with respect to the income of International. International was not subject to the taxes imposed by the notice of deficiency and, therefore, was not the "taxpayer" within the meaning of the relevant Code sections. The purpose of the statutory requirements is directly to inform a taxpayer of a claim against him for additional taxes due from him. See *Perlmutter v. Commissioner*, 44 T.C. 382, 400 (1965), affd. 373 F.2d 45 (10th Cir. 1967). We emphasize that we are not dealing with income for a taxable year in which International was determined not to qualify as a DISC. In view of the foregoing, we conclude that the notice of deficiency was properly sent to

---

[7]Sec. 995(a) provides:

SEC 995(a). GENERAL RULE.—A shareholder of a DISC or former DISC shall be subject to taxation on the earnings and profits of a DISC as provided in this chapter, but subject to the modifications of this subpart.

Goldberger, Inc. Compare *Bunnel v. Commissioner*, 50 T.C. 837, 842 (1968).

Goldberger, Inc., also contends that this Court does not have jurisdiction because the notice of deficiency did not set forth a reason or basis for disqualifying International as a DISC. Although section 6212(a) provides for the issuance of a notice of deficiency, there is no provision in the Code that specifies the proper form and the contents of the notice of deficiency. The requirements of section 6212(a) are generally met if the notice of deficiency sets forth the amount of the deficiency and the taxable year involved. *Foster v. Commissioner*, 80 T.C. 34, 229-230 (1983), affd. on this issue 756 F.2d 1430 (9th Cir. 1985), cert. denied 474 U.S. 1055.

The notice of deficiency informed Goldberger, Inc., that deficiencies had been determined and the taxable years to which they were applicable. The notice of deficiency made it clear that disqualification distributions were being made as a result of the failure of International to qualify as a DISC for the taxable year ended October 31, 1979. We are satisfied that the notice of deficiency meets the aforementioned standards.

We might lend a more sympathetic ear to a taxpayer who was not given adequate advance information of respondent's position by either the notice of deficiency or the pleadings so as to enable him to recognize the issues and prepare for trial. *Mayerson v. Commissioner*, 47 T.C. 340, 349 (1966). Goldberger, Inc., does not contend that it did not have adequate advance notice of respondent's position. The Commissioner, in the notice of deficiency dated March 16, 1983, had previously determined that International did not qualify as a DISC under sections 992(a) and 993(b). The disqualification distributions resulted from the previous determination. Indeed, it seems obvious from the trial record that Goldberger, Inc., was well aware of respondent's position.

In determining the propriety of the disqualification distributions we must decide whether International qualified as a DISC for its taxable year ended October 31, 1979. This would have occurred during Goldberger, Inc.'s taxable year ended September 30, 1980. There is no deficiency, a prerequisite to our jurisdiction, for the taxable year ended

September 30, 1980. Sec. 6213(a). However, our conclusion as to the status of International as a DISC for its taxable year ended October 31, 1979, is necessary to determine Goldberger, Inc.'s deficiency for its taxable year ended September 30, 1982, as well as to determine the net operating loss of Goldberger, Inc., for the taxable year ended September 30, 1981, which was carried back to its taxable year ended September 30, 1978, a year for which a deficiency was determined. Section 6214(b) provides that in redetermining a deficiency we may consider such facts with relation to the taxes for other years as may be necessary to correctly redetermine the amount of such deficiency. Accordingly, we conclude that we have jurisdiction to decide whether International qualified as a DISC for its taxable year ended October 31, 1979.

We turn now to the substantive issue of whether International qualified as a DISC for its taxable year ended October 31, 1979.

In general, a corporation that qualifies as a DISC is not taxable on its profits. Secs. 991 and 995(a). A portion of such profits is currently taxable to the shareholders, and tax is deferred on the remaining portion of the profits until such profits are actually withdrawn from the DISC or until the corporation ceases to qualify as a DISC. Sec. 995(b). One of the requirements for qualification as a DISC is that at least 95 percent of the adjusted basis of all the assets of the corporation at the close of its taxable year must be qualified export assets. Sec. 992(a)(1)(B). Such test is designed to ensure that substantially all of the assets of the DISC are devoted to exporting. H. Rept. 92-533 (1971), 1972-1 C.B. 498, 529. See *CWT Farms, Inc. v. Commissioner,* 79 T.C. 86, 91, supplemental opinion 79 T.C. 1054 (1982), affd. 755 F.2d 790 (11th Cir. 1985), cert. denied 477 U.S. 903 (1986).

The term "qualified export assets" is defined by section 993(b). That section provides that to be a qualified export asset, an asset must fall into one of nine categories.[8]

---

[8]Sec. 993(b) provides:

SEC. 993(b). QUALIFIED EXPORT ASSETS.—For purposes of this part, the qualified export assets of a corporation are—

(1) export property (as defined in subsection (c));

Respondent contends that the advances from International to Goldberger, Inc., were not qualified export assets and, therefore, at the close of its taxable year ended October 31, 1979, less than 95 percent of the adjusted basis of all of the assets of International were qualified export assets. Goldberger, Inc., contends that the advances fall within the category defined by section 993(b)(1). Section 993(b)(1) provides that qualified export assets include export property as defined in subsection (c). Section 993(c)(1) provides as follows:

(c) EXPORT PROPERTY.—

(1) IN GENERAL.—For purposes of this part, the term "export property" means property—

(A) manufactured, produced, grown, or extracted in the United States by a person other than a DISC,

(B) held primarily for sale, lease, or rental, in the ordinary course of trade or business, by, or to, a DISC, for direct use, consumption, or disposition outside the United States, and

(C) not more than 50 percent of the fair market value of which is attributable to articles imported into the United States.

International was involved in selling meat overseas, primarily to Japan. International did not have any credit in its own name. Goldberger, Inc., had a line of credit with Iowa Beef Processors, Inc., International's meat supplier.

---

(2) assets used primarily in connection with the sale, lease, rental, storage, handling, transportation, packaging, assembly, or servicing of export property, or the performance of engineering or architectural services described in subparagraph (G) of subsection (a)(1) or managerial services in furtherance of the production of qualified export receipts described in subparagraphs (A), (B), (C), and (G) of subsection (a)(1);

(3) accounts receivable and evidences of indebtedness which arise by reason of transactions of such corporation or of another corporation which is a DISC and which is a member of a controlled group which includes such corporation described in subparagraph (A), (B), (C), (D), (G), or (H), of subsection (a)(1);

(4) money, bank deposits, and other similar temporary investments, which are reasonably necessary to meet the working capital requirements of such corporation;

(5) obligations arising in connection with a producer's loan (as defined in subsection (d));

(6) stock or securities of a related foreign export corporation (as defined in subsection (e));

(7) obligations issued, guaranteed, or insured, in whole or in part, by the Export-Import Bank of the United States or the Foreign Credit Insurance Association in those cases where such obligations are acquired from such Bank or Association or from the seller or purchaser of the goods or services with respect to which such obligations arose;

(8) obligations issued by a domestic corporation organized solely for the purpose of financing sales of export property pursuant to an agreement with the Export-Import Bank of the United States under which such corporation makes export loans guaranteed by such bank; and

(9) amounts (other than reasonable working capital) on deposit in the United States that are utilized during the period provided for in, and otherwise in accordance with, regulations prescribed by the Secretary to acquire other qualified export assets.

The advances from International to Goldberger, Inc., were to be used to purchase merchandise to be sold by International. However, Iowa Beef Processors, Inc., discontinued supplying meat to International as of March 31, 1979. Sam tried for more than a year to replace the source of supply, but was unsuccessful. This indicates that as of October 31, 1979, the advances had not been used to purchase inventory. Accordingly, there was no property held primarily for sale, lease, or rental, in the ordinary course of trade or business, by, or to, a DISC, for direct use, consumption, or disposition outside the United States. Sec. 993(c)(1)(B). Therefore, the advances do not come within the definition of export property in section 993(c)(1).

Goldberger, Inc., cites *Expo-Chem, Inc. v. Commissioner*, T.C. Memo. 1983-212, for the proposition that the advances from International qualify as export property under section 993(c)(1) because the advances constituted prepayment to Goldberger, Inc., for inventory purchases to be delivered to International. We disagree. In *Expo-Chem, Inc. v. Commissioner, supra*, Expo, a DISC, made an advance to Miljac, a "brother-sister" corporation of Expo's parent corporation. The advance was used to purchase inventory for Expo as it was difficult or impossible for Expo to purchase inventory directly or to obtain credit because it had not dealt with suppliers in its own name prior to the taxable years in issue. After the end of Expo's taxable year, Miljac decided to sell the inventory domestically. Miljac returned the money used to purchase the inventory to Expo. The taxpayer argued that the advance was a qualified export asset under section 993(b)(4). We held that the advance was not a qualified export asset under section 993(b)(4). We further held that the advance did not fit into any other category of qualified export assets under section 993(b) and, in footnote 9 of the opinion, we stated as follows:

Expo's controller testified that the advance to Miljac "was categorized as a prepayment for the material that we might be buying from suppliers." Under other circumstances, such prepayment might constitute the acquisition of inventory under section 993(b)(1) and 993(c). The facts found here, however, do not justify such a categorization.

In considering the evidence, we note that a statutory notice of deficiency is ordinarily presumed correct, and the taxpayer bears the burden of persuasion (the ultimate burden) and the burden of going

forward with the evidence. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. In determining whether a corporate-petitioner has satisfied the burden of proof, dealings between it and related corporations are subjected to particularly close scrutiny. See *Gilbert v. Commissioner*, 262 F.2d 512 (2d Cir. 1959), affg. a Memorandum Opinion of this Court, cert. denied 359 U.S. 1002 (1959); *Field v. Commissioner*, T.C. Memo. 1974-25.

In *Expo-Chem, Inc. v. Commissioner, supra,* the advance was used to purchase inventory for Expo, yet we held that the advance was not a qualified export asset under section 993(b)(1) and (c). In the instant case, the advances were not used to purchase inventory for International. We have stated above that Iowa Beef Processors, Inc., discontinued supplying meat to International as of March 31, 1979, and Sam tried for over a year to replace the source of supply but was unsuccessful. Therefore, *Expo-Chem, Inc. v. Commissioner, supra,* does not support the proposition that the advances from International qualify as export property under section 993(c)(1).

Goldberger, Inc., also contends that the advances were qualified export assets under section 993(b)(4). Section 993(b)(4) provides that qualified export assets include, "money, bank deposits, and other similar temporary investments, which are reasonably necessary to meet the working capital needs of such corporation."

The term "temporary investments" is defined by section 1.993-2(e)(1), Income Tax Regs., as follows:

> *In general.* For purposes of this section, temporary investments are money, bank deposits (not including time deposits of more than 1 year), and other similar temporary investments to the extent maintained by a DISC as reasonably necessary to meet its requirements for working capital. For purposes of this paragraph, a temporary investment is an obligation, including an evidence of indebtedness as defined in paragraph (d)(1) of this section, which is a demand obligation or has a period remaining to maturity of not more than 1 year at the date it is acquired by the DISC. A temporary investment does not include trade receivables.

Section 1.993-2(e)(4), Income Tax Regs., provides that "An obligation issued or incurred by a member of a controlled group (as defined in sec. 1.993-1(k)) of which the DISC is a member is not a qualified export asset under this paragraph." Goldberger, Inc., and International were members

of a controlled group as defined in section 1.993-1(k), Income Tax Regs.[9]

Goldberger, Inc., challenges the validity of the portion of section 1.993-2(e)(4), Income Tax Regs., quoted above. It argues that Congress did not intend a "carte blanche" prohibition against a DISC placing a temporary investment with its parent corporation, as long as the purposes of the statutory scheme are served. Accordingly, it reasons that we should invalidate the portion of section 1.993-2(e)(4), Income Tax Regs., that excludes all such obligations from the definition of qualified export assets, as overbroad and in frustration of the legislative intent.

The Commissioner has broad authority to promulgate all needful regulations. Sec. 7805(a). The term used by Congress, "temporary investments," is general in nature and is not further defined. Further interpretation through an "interpretive" regulation is therefore particularly appropriate. We ordinarily defer to the Commissioner's interpretive regulations because "Congress has delegated to the Commissioner, not to the courts, the task of prescribing" such regulations. *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472, 477 (1979). It is well settled that Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Bingler v. Johnson*, 394 U.S. 741, 750 (1969). The Supreme Court has repeatedly declared, in strong and unequivocal terms, that Treasury regulations should not be struck down lightly. E.g., *Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 169 (1981). In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose. *United States v. Vogel Fertilizer*

[9]Sec. 1.993-1(k), Income Tax Regs., provides:

(k) *Definition of "controlled group."* For purposes of sections 991 through 996 and the regulations thereunder, the term "controlled group" has the same meaning as is assigned to the term "controlled group of corporations" by sec. 1563(a), except that (1) the phrase "more than 50 percent" is substituted for the phrase "at least 80 percent" each place the latter phrase appears in section 1563(a), and (2) section 1563(b) shall not apply. Thus, for example, a foreign corporation subject to tax under section 881 may be a member of a controlled group. Furthermore, two or more corporations (including a foreign corporation) are members of a controlled group at any time such corporations meet the requirements of section 1563(a) (as modified by this paragraph).

*Co.*, 455 U.S. 16 (1982); *National Muffler Dealers Association, Inc. v. United States, supra* at 477.

Under section 993(b)(4) the scope of the term temporary investments is unclear. Section 1.993-2(e)(1), Income Tax Regs., along with section 1.993-2(e)(4), Income Tax Regs., provides guidance as to what constitutes a temporary investment. The challenged regulation may exclude a particular type of asset from qualifying as a temporary investment; however, it does not contradict the plain language of section 993(b)(4).

In connection with the enactment of DISC legislation, Congress explained the reasons for such legislation:

it is important to provide tax incentives for U.S. firms to increase their exports. This is important not only because of its stimulative effect but also to remove a present disadvantage of U.S. companies engaged in export activities through domestic corporations. Presently, they are treated less favorably than those which manufacture abroad through the use of foreign subsidiary corporations. United States corporations engaging in export activities are taxed currently on their foreign earnings at the full U.S. corporate income tax rate regardless of whether these earnings are kept abroad or repatriated. In contrast, U.S. corporations which produce and sell abroad through foreign subsidiaries generally can postpone payment of U.S. tax on these foreign earnings so long as they are kept abroad. [H. Rept. 92-533 (1971), 1972-1 C.B. 498, 529; S. Rept. 92-437 (1971), 1972-1 C.B. 559, 609.]

The DISC provisions were to give tax breaks to domestic producers when and for only so long as the income produced was used for export production and not for domestic purposes. *CWT Farms, Inc. v. Commissioner*, 755 F.2d at 801. The legislative history does not shed any light on the definition of temporary investments. However, critics of the DISC proposal were concerned that tax-deferred DISC profits might be used by the DISC's parent (usually the export producer) for purposes unrelated to exporting. Hearings on H.R. 10947 before the Senate Comm. on Finance, 92d Cong., 1st Sess. 733-734 (1971) (Statement of Stanley S. Surrey). For this reason, Congress attempted to ensure that loans from a DISC to a producer are used only to encourage exporting. *CWT Farms, Inc. v. Commissioner*, 79 T.C. at 1065. Congress, therefore, provided strict guidelines that must be met before a loan by a DISC will constitute a qualified export asset. A loan by a DISC can constitute a

qualified export asset if it qualifies as a "producer's loan" under section 993(b)(5) and (d). *CWT Farms, Inc. v. Commissioner*, 755 F.2d at 796. Section 993(d)(1) provides as follows:

(d) PRODUCER'S LOANS.—
　(1) IN GENERAL.—An obligation, subject to the rules provided in paragraphs (2) and (3), shall be treated as arising out of a producer's loan if—
　　(A) the loan, when added to the unpaid balance of all other producer's loans made by the DISC, does not exceed the accumulated DISC income at the beginning of the month in which the loan is made;
　　(B) the obligation is evidenced by a note (or other evidence of indebtedness) with a stated maturity date not more than 5 years from the date of the loan;
　　(C) the loan is made to a person engaged in the United States in the manufacturing, production, growing, or extraction of export property determined without regard to subparagraph (C) or (D) of subsection (c)(2), (referred to hereinafter as the "borrower"); and
　　(D) at the time of such loan it is designated as a producer's loan.

In addition, a loan is a producer's loan only to the extent that it does not exceed the amount of the borrower's assets considered as being related to the borrower's export sales. Sec. 993(d)(2). Furthermore, a loan is a producer's loan only to the extent that it does not exceed the amount of the borrower's increased investment in export related assets during the year. Sec. 993(d)(3). The DISC legislation clearly reflects a congressional policy to limit producer's loans in order to ensure that tax-deferred DISC profits are used solely for exporting. *CWT Farms, Inc. v. Commissioner*, 79 T.C. at 1065.[10] It would be inconsistent with legislative intent to allow a DISC to advance tax-deferred profits to its parent without satisfying the requirements of section 993(b)(5) and (d) by merely labeling such advance a temporary investment. Accordingly, we hold that the challenged portion of section 1.993-2(e)(4), Income Tax Regs., is harmonious with the origin and purpose of the DISC legislation. The challenged portion of the regulation, therefore, is valid.

As a result, the obligations of Goldberger, Inc., to International cannot be qualified export assets under sec-

---

[10]*Goldberger, Inc., does not contend that the advances qualify as a producer's loan under sec. 993(b)(5) and (d).*

tion 993(b)(4). It is, therefore, unnecessary to consider whether the advances were "reasonably necessary" to meet the working capital needs of International. Inasmuch as the advances were not qualified export assets, the adjusted basis of International's qualfied export assets was less than 95 percent the adjusted basis of all its assets as of October 31, 1979. By reason of its failure to meet this asset test, International failed to qualify as a DISC for its taxable year ended October 31, 1979. [11]

### Salary

During the taxable years ended September 30, 1980, through September 30, 1982, Goldberger, Inc., paid Emma wages of $9,000 per year and deducted the salary on its Federal income tax returns.

Section 162(a)(1) allows a deduction for reasonable salaries paid or incurred during the taxable year in carrying on a trade or business. Emma had been a secretary for 21 years before becoming a nurse in 1972, and she testified that the reasonable value of the secretarial services she performed for Goldberger, Inc., was $9,000. In light of her testimony and her job duties as secretary, we find $9,000 to be a reasonable amount of compensation for her secretarial services.

Respondent points out that Emma testified, on cross-examination, that the $9,000 was to compensate her for nursing services provided for the benefit of Sam, as well as for secretarial services. However, we cannot overlook the fact that Sam lived and maintained an office in Emma's personal residence. Furthermore, Emma testified that Sam provided for her in his will. At his death, she was to have the balance remaining on her mortgage paid and she was to receive an income for life. This was not a typical employer/employee relationship. Based upon this affinity, we are inclined to believe that the nursing services were performed out of concern and a sense of caring and that no part of her salary was compensation for these services. Accordingly, we hold that Goldberger, Inc., is entitled to the salary deduction.

---

[11]*Expo-Chem, Inc. v. Commissioner*, T.C. Memo. 1983-212.

*Inventory Valuation*

Inventory accounting is governed by sections 446 and 471. Section 446(a) provides the general rule for methods of accounting, "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." The term "method of accounting" denotes not only the taxpayer's overall method of accounting, but also the treatment of any material item, such as inventory. Sec. 1.446-1(a)(1), Income Tax Regs. Section 446(b) provides that if the method used by the taxpayer "does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the [Commissioner], does clearly reflect income."

Section 471 prescribes the general rule for inventories as follows:

Whenever in the opinion of the [Commissioner] the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the [Commissioner] may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Section 471 establishes two distinct tests to which an inventory must conform. First, it must conform "as nearly as may be to the best accounting practice," a phrase that is synonymous with "generally accepted accounting principles." Second, it "must clearly reflect the income." Sec. 1.471-2(a), Income Tax Regs.; *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532 (1979).

It is obvious on their face that sections 446 and 471, with their accompanying regulations, vest the Commissioner with wide discretion in determining whether a particular method of inventory accounting should be disallowed as not clearly reflective of income. *Thor Power Tool Co. v. Commissioner, supra* at 532. Since the Commissioner has broad discretion, his interpretation of the statute's clear-reflection standard is not to be set aside unless it is shown to be plainly arbitrary or an abuse of discretion. *Thor Power Tool Co. v. Commissioner, supra* at 532-533; *Lucas v. Kansas City Structural Steel Co.*, 281 U.S. 264, 271 (1930); *Peninsula Steel Products*

*& Equipment Co. v. Commissioner*, 78 T.C. 1029, 1044 (1982). The taxpayer, therefore, has a heavy burden in overcoming a finding by the Commissioner that its method of accounting does not clearly reflect income. *Peninsula Steel Products & Equipment Co. v. Commissioner, supra* at 1044-1045.

Sam valued his inventory using the "lower of cost or market" method. Thomas Sherman, a certified public accountant and a tax partner with Coopers & Lybrand, testified that in his opinion, the inventory valuations made by Sam were in accordance with "generally accepted accounting principles." Respondent offered no evidence to rebut this testimony, so we conclude that there is no dispute that the first test of section 471 is satisfied. In general, an accounting method that conforms with "generally accepted accounting principles" that is consistently applied will be regarded as clearly reflecting income for tax purposes. Sec. 1.446-1(a)(2), Income Tax Regs. Conformity with "generally accepted accounting principles" is not sufficient, however, if the result is a failure to comply with the Code or the regulations. *Thor Power Tool Co. v. Commissioner, supra* at 538-544.

Under the "lower of cost or market" method of inventory accounting, the market value of each article is compared with the cost of the article, and the lower of such values is the inventory value of the article. Sec. 1.471-4(c), Income Tax Regs. Under ordinary circumstances and for normal goods in an inventory, "market" means the current "bid price" prevailing at the inventory date for the merchandise in the volume usually purchased by the taxpayer. Sec. 1.471-4(a), Income Tax Regs. The courts have uniformly interpreted "bid price" to mean replacement cost, that is, the price the taxpayer would have to pay on the open market to purchase or reproduce the inventory items. E.g., *D. Loveman & Son Export Corp. v. Commissioner*, 34 T.C. 776, 796 (1960), affd. 296 F.2d 732 (6th Cir. 1961), cert. denied 369 U.S. 860 (1962).

Dexter Nygaard testified as an expert witness on behalf of petitioner. Nygaard has been in the meat business since 1932. From 1970 until his retirement in 1982, he sold beef trimmings, beef briskets, and pastramis for Iowa Beef

Processors, Inc. Nygaard testified as to the gradual deterioration of frozen meat. Due to oxidation, the fat on the meat becomes rancid and sour, and as a result of dehydration, the meat becomes freezer burned. Nygaard testified that frozen pastrami was sold on a negotiated-price basis because before the purchaser knew exactly what he had, he had to thaw the meat, trim the freezer burned portions, and trim any rancid fat. Nygaard further testified that there was no open market for frozen pastrami. Based upon the testimony of Nygaard we conclude that there was no open market for frozen pastrami as the term is used in the regulations. Where there is no open market, the taxpayer is required to ascertain "bid price" by using "such evidence of a fair market price at the date or dates nearest the inventory as may be available, such as specific purchases or sales by the taxpayer or others in reasonable volume and made in good faith, or compensation paid for cancellation of contracts for purchase commitments." Sec. 1.471-4(b), Income Tax Regs.

All decisions concerning inventory valuation of meat products were made by Sam. However, he did not testify at trial because of poor health. Nygaard testified that after pastrami had been frozen for 9 months, people in the meat industry would automatically reduce the price 50 percent. He described pastrami that had been frozen for a year as salvage meat. He further testified that after pastrami had been frozen for a year and a half, it had no value. Nygaard testified that the inventory was valued in accordance with industry custom, and that in his opinion, the inventory was valued on a reasonable basis. George Mergens has kept the books of the sole proprietorship and Goldberger, Inc., since 1970. He testified that it was customary in the industry to price meat that was 6 months old at half the value of the purchase price, and to price meat that was a year old at no value or salvage value.

An examination of the inventory values reveals that industry custom was not consistently adhered to. For example, lot 3629 was purchased on August 8, 1980, for 92 cents per pound. Lot 4846 was purchased on October 17, 1980, for 95 cents per pound. Both lots, each of which had been in inventory for less than 5 months, were valued at 70 cents per pound in ending inventory for the taxable year

1980. In another instance, lots 0417 and 2890 which were at least 10 months old at the end of the taxable year 1981, were valued at cost in ending inventory.

There are also inconsistencies in the valuations. For example, lots 1891 and 1970 were purchased on January 16, 1980, and January 21, 1980, respectively. The lots were purchased for 95 cents per pound and valued at 50 cents per pound in ending inventory for the taxable year 1980. However, they were valued at 95 cents per pound in ending inventory for the taxable year 1981.

More importantly, there is scant evidence of actual sales. With respect to inventory for the taxable year 1980, lot 1904 and 37 boxes of lot 1970 were sold on January 9, 1981. The sale was originally for 70 cents per pound; however, actual payment was 50 cents per pound. Both lots were valued at 50 cents per pound in ending inventory for the taxable year 1980, and the sales price establishes the correctness of the inventory valuation. Lots 8034A and 8076A were sold on January 15, 1981, for 58 cents per pound. Both lots were valued at cost in ending inventory for the taxable year 1980 as they were less than 1½ months old at yearend. This sale provides little guidance as the lots were valued at cost.

There are several lot numbers which appear in the ending inventory for the taxable year 1980 which do not appear in the ending inventory for the taxable year 1981. We assume these lots were sold, but there is no evidence indicating when the lots were sold or the sales prices. With respect to inventory for the taxable year 1981, lot 8572 was sold in February 1982, and lots 0200, 71314, 3629, and 4846, were sold in March 1982. However, there was no evidence as to the sales prices. If evidence of these sales had been introduced, it may have been helpful in reaching a conclusion that Sam properly valued the inventory.

Sam did not consistently follow industry custom, and introduced evidence with respect to only two sales. Even though the January 9, 1981, sale established the correctness of the inventory valuation, this is insufficient in light of the fact that the pastrami was a deteriorating commodity. In other words, the sales price of pastrami that had been frozen for 2 months does not necessarily establish the sales

price of pastrami that had been frozen for 7 months. This is particularly significant when other lots of varying age were sold, but no evidence as to the sales prices was introduced. Sam thus failed to establish that he valued the inventory in accordance with sec. 1.471-4(b), Income Tax Regs.

We recognize that the valuations made by Sam were not wholly inconsistent with industry custom. However, we emphasize that Sam bears a heavy burden of proof with respect to overcoming a finding by the Commissioner that his inventory valuations did not clearly reflect income. Although the discretion of the Commissioner under sections 446 and 471 is not unbridled and may not be arbitrary, we sustain his exercise of discretion here.

Sam makes an additional argument with respect to pastrami which had been frozen for 6 months. He contends that pastrami which had been frozen for 6 months was subnormal and should be valued in accordance with section 1.471-2(c), Income Tax Regs. Nygaard testified that he considered pastrami which had been frozen for 6 months a subnormal product. Section 1.471-2(c), Income Tax Regs., provides that if goods are "unsalable at normal prices or unusable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes," the taxpayer is permitted to value the goods "at bona fide selling prices less direct cost of disposition." "Bona fide selling price" is defined as an "actual offering of goods during a period ending not later than 30 days after inventory date." Sec. 1.471-2(c), Income Tax Regs. The taxpayer bears the burden of proving that "such exceptional goods as are valued upon such selling basis come within the classifications indicated," and is required to "maintain such records of the disposition of the goods as will enable a verification of the inventory to be made." Sec. 1.471-2(c), Income Tax Regs. Thus, as a general rule, inventory falling within the categories set forth in the regulation is to be valued by reference to "an actual offering of goods during a period ending not later than 30 days after inventory date." Sec. 1.471-2(c), Income Tax Regs.

Respondent argues that there has not been an actual offering of such goods within 30 days after the inventory

date. With respect to inventory for the taxable year 1980, there was evidence of only one sale within 30 days after inventory date of pastrami that had been frozen for more than 6 months. Lot 1904 and 37 boxes of lot 1970 were sold on January 9, 1981. With respect to inventory for the taxable year 1981, there was no evidence of a sale within 30 days after inventory date of pastrami that had been frozen over 6 months. The only evidence to establish actual offers was the testimony of Mergens that he did not recall a period of 30 days or more when Sam had not offered such products for sale. This testimony is insufficient to establish actual offers.

When the taxpayer seeks to value its inventory under section 1.471-2(c), Income Tax Regs., it must substantiate its lower inventory valuation by providing evidence of actual offerings, actual sales, or actual contract cancellations. In the absence of objective evidence of this kind, the assertions of a taxpayer as to the "market value" of its inventory are not cognizable in computing its income tax. *Thor Power Tool Co. v. Commissioner, supra* at 535.

Sam also contends that pastrami that had been frozen for a year did not have to be offered for sale within 30 days of the inventory date because the inventory was sufficiently damaged as to be considered completely worthless, except as scrap. See *Queen City Woodworks & Lumber Co. v. Crooks*, 7 F. Supp. 684 (S.D. Mo. 1934). Nygaard described pastrami that had been frozen for a year as salvage meat. Mergens testified that it was customary in the industry to price meat that was a year old at no value or salvage value.

With respect to the taxable year 1980, the sale of lot 1904 and 37 boxes of lot 1970 occurred almost a year after their purchase. The meat was purchased for 95 cents per pound and sold for 50 cents per pound. With respect to the taxable year 1981, lots 8572, 0200, 0417, 71314, 3629, and 4846, all of which were over a year old, were sold in February or March 1982. However, no evidence was introduced as to the sales prices. Based upon the available evidence, we are not convinced that the pastrami that had been frozen for a year or longer was completely worthless, except as scrap.

Sam relies on *Floyd v. Commissioner*, 11 B.T.A. 903 (1928), for the proposition that his valuation of inventory is acceptable if there is no quoted market and if his experience in estimating value is established. This reliance is misplaced. *Floyd v. Commissioner, supra,* dealt with the valuation of cotton of irregular, damaged, and unmerchantable grades and sweepings for the taxable year 1919. There was no quoted market for this kind of cotton. The taxpayer had been engaged in the cotton business for approximately 50 years and was familiar with the market prices of that character of cotton. On account of the taxpayer's long experience and familiarity with the market prices of the property dealt in by him, and the fact that no conflicting or impeaching testimony was introduced, we accepted the valuation of the taxpayer as the market price of his cotton for the calendar year 1919. *Floyd v. Commissioner, supra* at 907.

Section 1.471-2(c), Income Tax Regs., along with its requirement of an actual offering of goods within 30 days after inventory date, was promulgated subsequent to *Floyd v. Commissioner, supra.* The predecessor to section 1.471-2(c), Income Tax Regs., was first promulgated in Regs. 62, art. 1582 (1922). Accordingly, section 1.471-2(c), Income Tax Regs., and the case law interpreting it are controlling.

## Rent

Sam maintained Emma's home as a residence. A portion of the main living area or "Florida" room contained his desk and supplies and an alcove off of the bedroom was used as an office. Rent of $2,500 and $6,500 was paid to Emma for the taxable years 1980 and 1981, respectively, and Sam deducted the rent on his Federal income tax returns as an expense of his sole proprietorship.

Section 280A(a)[12] generally provides that no deduction is allowed with respect to the personal residence of a taxpayer. Section 280A(c)(1)(A), however, provides that section 280A(a) shall not apply if a portion of the personal residence of a taxpayer is exclusively used on a regular basis as the

---

[12]Whether rent paid for a personal residence is deductible as a home office expense is governed by sec. 280A. *Baie v. Commissioner,* 74 T.C. 105 (1980).

principal place of business for any trade or business of the taxpayer.

The evidence satisfies us that the house was used by Sam on a regular basis as the principal place of business of his sole proprietorship. However, the evidence fails to establish that any portion of the house was used exclusively for business purposes. The legislative history of section 280A dealing with exclusive use provides as follows:

> Exclusive use of a portion of a taxpayer's dwelling unit means that the taxpayer must use a specific part of a dwelling unit solely for the purpose of carrying on his trade or business. The use of a portion of a dwelling unit for both personal purposes and for the carrying on of a trade or business does not meet the exclusive use test. Thus, for example, a taxpayer who uses a den in his dwelling unit to write legal briefs, prepare tax returns, or engage in similar activities as well for personal purposes, will be denied a deduction for the expenses paid or incurred in connection with the use of the residence which are allocable to these activities. [S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 186; H. Rept. 94-658 (1975), 1976-3 (Vol. 2) 695, 853.]

Because no portion of the house was used by Sam exclusively for business purposes, he does not escape the general prohibition of section 280A(a) of deductions with respect to use of his residence. Accordingly, we disallow the rent deductions.

Furthermore, the rent payments for the taxable year 1980 were made pursuant to a lease between Emma and Goldberger, Inc. For this additional reason, the rent payments for the taxable year 1980 are not deductible by Sam. Sec. 1.162-1(a), Income Tax Regs.

### Travel and Entertainment

Sam deducted $17,266 of travel and entertainment expenses on his Federal income tax return for the taxable year 1981 as expenses of his sole proprietorship. He did not maintain an account book, diary, or statement of expenses that set forth the specific purpose of any travel or entertainment expense.

Section 162(a) allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. However, section 274(d) imposes additional requirements for the substantia-

tion of expenses for travel, entertainment, and gifts. Section 274(d) requires that the taxpayer substantiate by "adequate records or by sufficient evidence corroborating his own statement" the amount of the expense, the time and place of the travel or entertainment, the business purposes of the expense, and the business relationship to the taxpayer of the persons entertained.[13] Each of the foregoing elements must be proved for each separate expenditure. General or vague proof, whether offered by testimony or documentary evidence, will not suffice. Specificity is imperative. See *Dowell v. United States*, 522 F.2d 708 (5th Cir. 1975), cert. denied 426 U.S. 920 (1976).

The substantiation requirements are clarified and explained in detail by the regulations.[14] The regulations under section 274 provide that in order to meet the "adequate records" requirement, a taxpayer must maintain "an account book, diary, statement of expense or similar record * * * and documentary evidence * * * which, in combination, are sufficient to establish each element of an expenditure" specified in the statute and regulations. Sec. 1.274-5(c)(2)(i), Income Tax Regs.

In the absence of adequate records to substantiate each element of an expense, a taxpayer may alternatively establish such element by "his own statement, whether written or oral, containing specific information in detail as to such element," and by "other corroborative evidence sufficient to establish such element." Sec. 1.274-5(c)(3), Income Tax Regs.

---

[13]Sec. 274(d) provides:

SEC. 274(d). SUBSTANTIATION REQUIRED.—No deduction shall be allowed—

(1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home),

(2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or

(3) for any expense for gifts,

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. * * *

[14]Sec. 1.274-5, Income Tax Regs. The validity of the substantiation regulations was upheld by this Court in *Sanford v. Commissioner*, 50 T.C. 823 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969), cert. denied 396 U.S. 841 (1969).

Sam did not maintain an account book, diary, or statement of expense that set forth the business purpose of any travel or entertainment expense. At trial, he introduced into evidence some receipts for airline tickets. Some of these receipts were sufficient to establish the amount of the expenditure and the destination of the trip. However, none of the receipts recorded the date of return and the number of days away from home spent on business or the business purpose of the trip. Sec. 1.274-5(b)(2), Income Tax Regs. No documentary evidence concerning meals, lodging, or entertainment was introduced into evidence. Thus, he failed to qualify under the "adequate records" test of section 1.274-5(c)(2), Income Tax Regs.

Sam did not testify at trial because of poor health and he did not submit a written statement containing information regarding the travel and entertainment expenses. Emma testified concerning the travel expenses; however, her testimony was vague and merely consisted of looking at the airline ticket receipts and testifying as to with whom Sam had business dealings in the city listed, if she knew. Thus, Sam failed to qualify under the alternative test of section 1.274-5(c)(3), Income Tax Regs.

Sam contends that pursuant to Rev. Rul. 74-433, 1974-2 C.B. 92, he should be allowed a deduction for the minimum per diem of $44 per day for travel-away-from-home expenses. However, Rev. Rul. 74-433, *supra*, speaks to the allowance of a per diem paid to an employee, which Sam is not. *Smith v. Commissioner*, 80 T.C. 1165, 1171 (1983).

Therefore, Sam was unable to substantiate his travel and entertainment expenses, either by adequate records or by other sufficient evidence corroborating his own statement, and we are not at liberty to estimate what those expenses might have been.[15] Accordingly, we disallow the claimed travel and entertainment expenses.

---

[15]Sec. 274 was specifically designed to overturn, in this area, the rule in *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930), which permitted a court to make as close an approximation of the amount of the expenditure as it could. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 427; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 741.

## Sale of Cabin

During 1981, Sam sold a cabin which had been situated on land that he owned in Luck, Wisconsin. On his Federal income tax return for the taxable year 1981, he did not report the proceeds from the sale as income.

Section 61(a)(3) provides that gross income includes "gains derived from dealings in property." Section 1.61-6(a), Income Tax Regs., provides that when a portion of a larger property is sold, the basis of the property shall be equitably apportioned among the components, and the gain realized or loss sustained on the component sold is the difference between the selling price and the basis allocated to the component. The sale of each component is treated as a separate transaction. If a rational apportionment of the basis to the interest sold cannot be made, the consideration received on the sale may be credited against the basis for the entire property. See *Inaja Land Co. v. Commissioner*, 9 T.C. 727, 735-736 (1947). Whether apportionment cannot be made is a question of fact on which Sam has the burden of proof. *Fasken v. Commissioner*, 71 T.C. 650, 657 (1979).

Sam introduced no evidence as to the basis of the cabin or any reason why apportionment could not be made. Accordingly, the proceeds from the sale of the cabin are includable in income.

## Section 6653(a) Additions to Tax

The final issue for decision is whether Goldberger, Inc., and Sam are liable for the additions to tax pursuant to section 6653(a)(1) and (2). Section 6653(a)(1) and (2) provides for the imposition of additions to tax for the underpayment of tax due to negligence or intentional disregard of rules or regulations. Petitioners bear the burden of proving that the determination of the additions is erroneous. *Bixby v. Commissioner*, 58 T.C. 757, 791-792 (1972).

We deal first with Goldberger, Inc. The additions were determined against Goldberger, Inc., for its taxable years ended September 30, 1979, and September 30, 1982. The deficiency for the taxable year ended September 30, 1979, occurred as a result of adjustments eliminating the net operating loss incurred in the taxable year ended September

30, 1982, which was carried back to the taxable year ended September 30, 1979. The taxable year ended September 30, 1982, involved the DISC and salary issues. As a result of a concession by respondent dealing with a bad debt deduction and our conclusion with respect to the salary issue, there remains a net operating loss for the taxable year ended September 30, 1982. Accordingly, there is no deficiency for the taxable year ended September 30, 1982. However, the net operating loss for the taxable year ended September 30, 1982, is not sufficient to eliminate the income for the taxable year ended September 30, 1979. Although we have held that Goldberger, Inc.'s treatment of International was erroneous, we do not think the treatment was due to negligence or intentional disregard of the Commissioner's rules and regulations. Therefore, Goldberger, Inc., is not liable for the additions to tax determined under section 6653(a).

We next deal with Sam. The additions were determined against Sam for the taxable years 1977, 1980, and 1981. The deficiency for the taxable year 1977 occurred as a result of adjustments eliminating the net operating loss incurred for the taxable year 1980 which was carried back to the taxable year 1977. The taxable year 1980 involved the inventory valuation and rent issues. Although we have held that Sam's treatment of these items was erroneous, we do not think the treatment was due to negligence or intentional disregard of the Commissioner's rules and regulations. For the taxable year 1981, there is no deficiency as a result of a concession by respondent dealing with Social Security income. Therefore, Sam is not liable for the additions to tax determined under section 6653(a).

To reflect the foregoing,

*Decisions will be entered under Rule 155.*