RANDY G. DOFFIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Doffin v. Commissioner
Docket No. 25750-89
United States Tax Court
T.C. Memo 1991-114; 1991 Tax Ct. Memo LEXIS 127; 61 T.C.M. (CCH) 2157; T.C.M. (RIA) 91114; March 18, 1991, Filed *127 Decision will be entered under Rule 155. Garry A. Pearson, for the petitioner. Gail K. Gibson, for the respondent. WRIGHT, Judge. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in and additions to petitioner's Federal income taxes: Additions to tax
Year
Deficiency
Sec. 6653(a)(1)(A) [1]
Sec. 6661(a)
1986
$ 18,084.00
* $ 904.20
$ 4,521.00
1987
8,963.00
* 448.15
2,241.00
The issues for our consideration involve petitioner's gambling activities during the years in question. The questions presented are: (1) Whether respondent's statutory notice was arbitrary, excessive, or without foundation so that the burden of going forward with the *128 evidence is placed on respondent; (2) whether petitioner is entitled to more gambling losses than allowed by respondent; (3) whether petitioner is liable for section 6653(a) additions to tax for negligence or intentional disregard of rules and regulations; (4) whether petitioner is liable for the section 6661(a) addition for substantial understatement of income tax liability. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner, Randy G. Doffin, resided in Fargo, North Dakota, at the time the petition was filed in this case. During the years 1983 through 1985, petitioner became entrenched in debt and faced serious financial difficulties. In 1985, petitioner's financial position became so bleak that his father, George Doffin, arranged for petitioner's enrollment with a credit counseling service, the Village Family Service Center, in Fargo, North Dakota. During 1986 and 1987, the taxable years in issue, petitioner was employed in Fargo as a car salesman with Overvold Motors, Inc. In 1986, petitioner filed a U.S. Individual Income Tax Return reporting gross *129 wages from Overvold Motors of $ 20,177. Petitioner's 1986 W-2 Statement disclosed net wages of $ 14,717 after the withholding of Federal and State taxes. On his 1986 income tax return, petitioner failed to report $ 3,070 in prizes and awards received from Overvold Motors. Petitioner concedes that the $ 3,070 in prizes and awards should have been included in his 1986 gross income. In 1987, petitioner filed a U.S. Individual Income Tax Return reporting gross wages from Overvold Motors of $ 12,540. Petitioner's 1987 W-2 Statement disclosed net wages of $ 9,520 after withholding. Throughout taxable years 1986 and 1987, petitioner gambled extensively. On his 1986 and 1987 income tax returns, petitioner failed to report any gambling winnings or losses. Respondent, in his notice of deficiency, determined that petitioner had gambling income and allowable corresponding losses in the following amounts: Year
Gambling Income
Gambling Losses
1986
$ 46,240
$ 494
1987
32,571
-0-
Petitioner admits that he had unreported gross income from his gambling activities, but contends that he sustained losses in excess of the winnings determined by respondent. Petitioner did not maintain *130 a contemporaneous log book of his daily winnings and losses and did not retain any losing tickets to substantiate his losses. Petitioner also concedes that he had winnings for which no records existed for him or respondent to determine the amount. Many States, including North Dakota, permit charitable gambling operations. In Fargo, several of the charitable gambling establishments utilize pulltab gambling. During 1986 and 1987, petitioner was heavily engaged in pulltab gambling. Pulltab gambling involves purchasing tickets contained in a large old-fashioned cookie jar from the jar attendant. The player pays the jar attendant, receives his tickets, and pulls the tabs to determine whether they are winners or losers. If the ticket is a winner, it is given to the jar attendant in exchange for cash. If a player purchases a losing ticket, the common practice is to throw the ticket on the floor. Losing tickets were thrown on the floor in such quantity that the fire marshall in North Dakota considered it a fire hazard and established requirements for gaming sites to rake the tickets off the floor and place them in metal trash bins. Adjacent to each pulltab jar is a chart disclosing *131 the defined payout to players and the defined profit for the gambling operation. Pulltab jars played by petitioner generally provided a return of 76 to 82 percent of the funds wagered by the player. For example, one jar played by petitioner contained 2,232 tickets costing $ 1 each. The jar had four $ 100 winners, four $ 75 winners, four $ 50 winners, twelve $ 20 winners, sixty $ 5 winners, and two hundred $ 2 winners. The defined payout to players totaled $ 1,840. The defined profit inuring to the charitable gambling organization was $ 392. Of the 2,232 tickets, 284 (12.7 percent) were winning tickets. The definitive profit of this particular pulltab jar was approximately 17.6 percent ($ 392/$ 2,232). From January 1986 through June 1986, petitioner engaged in pulltab gambling at an establishment named the Monte Carlo. The pulltab profits derived from the Monte Carlo inured to the benefit of the Fargo-Moorhead Civic Opera. From July 1986 through December 1987, petitioner gambled at an establishment named the Rockin' Fifties. The pulltab gambling profits from the Rockin' Fifties were designated to benefit the Fargo-Moorhead Aquatics organization. Petitioner had been divorced *132 since 1978, was lonely, and sought to fill this void by frequenting charitable gambling establishments that carried on pulltab gambling. Throughout 1986 and 1987, petitioner engaged in pulltab gambling six days a week, approximately five or six hours a day. Petitioner could not gamble on Sundays because the gambling establishments were closed. Often petitioner purchased so many tickets from a particular pulltab jar that his losses from the jar exceeded the jar's defined profit. When this occurred petitioner would minimize his losses by "dumping the jar," which involved purchasing all the jar's remaining tickets. On one occasion petitioner played a jar called the "Diamond Cherry Bell." The Diamond Cherry Bell had a defined profit of $ 820. Petitioner played the jar until he lost approximately $ 900 on the jar. In order to minimize his total loss he "dumped the jar" to recoup at least $ 80 of his $ 900 loss. Throughout 1986 and 1987, petitioner constantly searched for funds to supply his pulltab gambling habit. From January 1986 through March 1987, petitioner's paycheck from Overvold Motors was generally paid directly to the credit counseling service. The credit counseling *133 service would make sure that certain periodic bills were paid and also provided petitioner with a weekly allowance. Petitioner used his weekly allowance, funds borrowed from his father and friends, and his gambling winnings, primarily to purchase more pulltab tickets. Although petitioner had few assets, he occasionally obtained gambling money by selling personal assets such as his motorcycle and videocassette recorder. Petitioner spent a substantial amount of his nonworking hours pulltab gambling at the Monte Carlo or the Rockin' Fifties. Under North Dakota State law, charitable organizations which sponsored gambling were required to keep written records of wins of $ 100 or greater. Respondent reviewed the records of several charitable organizations which conducted gambling in the Fargo area, including the Monte Carlo and the Rockin' Fifties. The records of gambling winnings listed individual players. For taxable year 1986, the records indicated that petitioner had 247 winning pulltabs valued at $ 100 or more, totaling $ 46,240. In taxable year 1987, the records indicated that petitioner had 133 winning pulltabs valued at $ 100 or more, totaling $ 32,571. For taxable year *134 1986, respondent allowed petitioner to deduct gambling losses of $ 494 as an itemized deduction. Respondent determined the $ 494 loss by allowing petitioner a $ 2 deduction for each of the 247 winning pulltab tickets for which records existed in accordance with North Dakota law. In 1987 petitioner was unable to itemize deductions, therefore no gambling losses were allowed. After compiling a record of petitioner's winning tickets, respondent determined that petitioner received net gambling income that is substantial both in dollar amount and in relation to petitioner's other income, as illustrated by the following table: Reported
Net Gambling
Percent
Year
Total Income
Income
Increase
1986
$ 20,177
$ 45,746
227
1987
12,688
32,571
257
Rodger Mohagen, a certified public accountant, prepared an unaudited Statement of Financial Condition for petitioner which included the years ending 1986, 1987, and 1988. Mohagen also prepared a statement of petitioner's deposits and disbursements for taxable years 1986 and 1987. From January 1986 to March 1987, petitioner did not have a bank account as his paychecks generally were deposited with the credit counseling service. *135 The credit counseling service issued payments for petitioner's periodic bills such as lot rent, trailer, phone, utilities, cable fees, insurance, taxes, medical expenses, and credit fees. No record of expenditures for food, gas, or clothing existed. Petitioner and his father opened a bank account for petitioner's use in April 1987. Petitioner's father closely monitored the account and signed most of the checks in an effort to help petitioner manage his money. Mohagen used bank statements and canceled checks to compile a statement of petitioner's deposits and disbursements from April 1987 through December 1987. Mohagen also contacted 41 banking and financial institutions in the Fargo-Moorhead area to confirm that petitioner had no other banking activity. In taxable year 1986, petitioner's deposits totaled $ 12,539, and his disbursements were $ 12,528. For taxable year 1987, petitioner's deposits totaled $ 14,356, and his disbursements were $ 13,284. Petitioner had a negative net worth of approximately $ 2,000 as of December 31, 1986, and a positive net worth of approximately $ 1,000 as of December 31, 1987. During taxable years 1986 and 1987, petitioner lived in a mobile *136 home at the Buena Vista Trailer Park in Fargo, North Dakota. The cost of the mobile home was between $ 16,000 and $ 18,000. Petitioner's father supplied funds for the down payment and acted as a guarantor for the balance of the loan. Petitioner owned an automobile with an approximate value of $ 4,000 as of December 31, 1986. At some point in 1987, petitioner traded or sold his automobile and acquired another vehicle valued at $ 6,000 as of December 31, 1987. Petitioner had an insignificant cash balance with the credit counseling service as of December 31, 1986. As of December 31, 1987, petitioner's cash balance was approximately $ 1,000. Petitioner also carried cash on his person which was used primarily for his daily gambling activities. Petitioner's failure to report gambling income for the years in issue was based upon his firm conviction that his losses exceeded his winnings although he was unable to verify his conviction by referring to a contemporaneous daily log or purchased pulltab tickets. OPINION The issues for our consideration involve petitioner's gambling activities during 1986 and 1987. As a preliminary matter, petitioner contends that the burden of going forward *137 with the evidence is placed on respondent because respondent's statutory notice was arbitrary or without foundation. We disagree. A statutory notice ordinarily carries with it a presumption of correctness that, except where provided in the Internal Revenue Code or the Tax Court Rules of Practice and Procedure, places the burden of proof and the burden of going forward with the evidence on petitioner. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). However, a showing by petitioner that the statutory notice is arbitrary or without foundation has the effect of placing the burden of going forward with the evidence on respondent. Helvering v. Taylor, 293 U.S. 507, 79 L. Ed. 623, 55 S. Ct. 287 (1935); Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979); Pizzarello v. United States, 408 F.2d 579 (2d Cir. 1969); Jackson v. Commissioner, 73 T.C. 394 (1979). When petitioner asks the Court to find a statutory notice arbitrary, he is asking the Court to look behind the statutory notice to examine the evidence used by respondent in making his determination. Riland v. Commissioner, 79 T.C. 185, 201 (1982); *138 Jackson v. Commissioner, supra at 400. We have looked behind the notice of deficiency in those rare instances involving illegal unreported income where respondent introduced no substantive evidence but rested on the presumption of correctness, Jackson v. Commissioner, supra at 401, where respondent relied upon a "'naked' assessment without any foundation whatsoever," United States v. Janis, 428 U.S. 433, 441, 49 L. Ed. 2d 1046, 96 S. Ct. 3021 (1976), or where there is substantial evidence of unconstitutional conduct by respondent in determining the deficiency. See Graham v. Commissioner, 82 T.C. 299, 308-309 (1984), affd. 770 F.2d 381 (3d Cir. 1985). Even assuming that this case presents such a "rare instance," petitioner's contention that respondent's determination is arbitrary lacks merit. The determination of deficiencies by respondent was based on documentation provided by charitable gambling operators. The Monte Carlo and the Rockin' Fifties were required to keep written records for wins of $ 100 or more. Respondent utilized these written records to make his determination. Moreover, petitioner failed *139 to keep records to substantiate his wins and losses. Respondent should not suffer adverse consequences from petitioner's failure to keep adequate records. "[T]he taxpayer should not be allowed to avoid paying income taxes simply because he keeps incomplete records." Adamson v. Commissioner, 745 F.2d 541, 548 (9th Cir. 1984), affg. a Memorandum Opinion of this Court. We find enough evidence to support a foundation for the notice of deficiency, and hold that the burden of going forward as well as the burden of proof rests with petitioner. The next issue for consideration is whether petitioner is entitled to more gambling losses than allowed by respondent. Respondent allowed petitioner a $ 2 deduction for each of the 247 winning tickets purchased in 1986, or a total of $ 494. No gambling losses were allowed for taxable year 1987 because petitioner lacked sufficient deductions to itemize. Petitioner admits that he had gambling winnings in excess of the $ 46,240 amount determined by respondent for 1986, and the $ 32,571 amount determined for 1987. However, petitioner contends that his gambling losses exceeded the determined amounts and other gambling winnings. *140 Section 165(d) allows a deduction for gambling losses only to the extent of gains therefrom. Petitioner has the burden of proving that his alleged losses were in fact sustained; the issue is a factual one, to be decided on the basis of all the evidence. Fogel v. Commissioner, 237 F.2d 917 (6th Cir. 1956), affg. per curiam a Memorandum Opinion of this Court; Green v. Commissioner, 66 T.C. 538, 544 (1976). Section 6001 and the regulations thereunder require a taxpayer to keep permanent records sufficient to substantiate the amount of gross income, deductions, and credits shown on his income tax return. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. Respondent has suggested that gamblers regularly maintain a diary, supplemented by verifiable documentation, of gambling winnings and losses to comply with section 6001. See Rev. Proc. 77-29, 1977-2 C.B. 538. Petitioner did not maintain contemporaneous records of his gambling wins and losses during 1986 or 1987. Notwithstanding the infirmities in petitioner's substantiation, we have allowed losses in similar cases based on estimates where we are convinced that a loss was sustained, *141 based on Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). See Drews v. Commissioner, 25 T.C. 1354 (1956); Forman v. Commissioner, T.C. Memo 1988-64; Kalisch v. Commissioner, T.C. Memo 1986-541. Before we will apply the Cohan rule, however, there must be sufficient evidence in the record to show that some loss was in fact sustained. Stein v. Commissioner, 322 F.2d 78, 83 (5th Cir. 1963), affg. a Memorandum Opinion of this Court; Schooler v. Commissioner, 68 T.C. 867, 871 (1977). Here we are convinced that petitioner sustained gambling losses in 1986 and 1987, but not to the extent he claims. We therefore apply the Cohan rule in this case. For the most part, we find petitioner's testimony honest and credible. During the years in issue, petitioner was a person of only moderate means. In 1986, petitioner's net wages equaled $ 14,717, not including the $ 3,070 bonus from Overvold Motors. In 1987, petitioner had net wages of $ 9,520. From January 1986 to March 1987, petitioner was enrolled with a credit counseling service due to his unfavorable financial *142 position. From April 1987 through December 1987, petitioner's father, George Doffin, monitored petitioner's checking account in an effort to enhance petitioner's money management skills. For the years in issue, petitioner did not enjoy a lavish lifestyle. Petitioner lived in a mobile home valued between $ 16,000 and $ 18,000. Petitioner's father provided the downpayment for the purchase of the mobile home. Petitioner had few other assets that would indicate any significant accessions to wealth in 1986 or 1987. To combat his shortage of funds for pulltab gambling, he sold his motorcycle and videocassette recorder. Petitioner also borrowed money from his father and friends on occasion in order to support his gambling habit. Furthermore, on this record it is clear that petitioner relied heavily on gambling winnings as a source of cash to purchase more pulltab tickets. Having few assets and little other income, petitioner regularly poured his gambling winnings back into the purchase of more pulltab tickets in order to satisfy his gambling desires. Petitioner's lifestyle and financial position did not indicate an increase in income of $ 45,746 in 1986, and $ 32,571 in 1987. *143 The unaudited Statements of Financial Position for 1986 and 1987 disclose only a slight increase in petitioner's net worth. The record of petitioner's deposits and disbursements indicated deposits of $ 12,539 and disbursements of $ 12,528 in 1986. In 1987, deposits were $ 14,356 and disbursements were $ 13,284. We believe that petitioner has adequately shown that winnings not offset by losses could not have been as great as the amount determined by respondent. That is, we do not believe that petitioner's taxable income could have been increased by 227 percent in 1986 or 257 percent in 1987 without some visible change in petitioner's net worth. In addition, petitioner played pulltabs six days a week, averaging five or six hours a day. Respondent allowed only a $ 494 loss representing the cost of the 247 winning pulltab tickets for taxable year 1986. [2] Under respondent's methodology, petitioner had to purchase 247 consecutive winning tickets valued each at $ 100 or more. This, of course, would be nearly impossible when considering that in a typical game there may be only four $ 100 winners out of 2,232 tickets contained in the pulltab jar. The odds against purchasing a $ 100 *144 winner from such a jar are 558 to 1 on the first chance. Applying the law of conditional probability, the odds against purchasing two consecutive $ 100 winners are approximately 414,966 to 1. The odds against purchasing 247 consecutive winners of $ 100 or more are astronomical. We find it unlikely that petitioner's only gambling expenses consisted of $ 494 spent for the purchase of 247 consecutive winning tickets of $ 100 or more. Furthermore, each pulltab jar had a defined profit designated for the benefit of a charitable organization and a defined payout to the pulltab player. A typical payout ranged from 76 to 82 percent of every dollar spent. Therefore, a pulltab player gambling over a significant period of time for several hours each day is not likely to achieve the success that respondent attributes to petitioner. After considering *145 all the evidence, we find that petitioner should be allowed gambling losses in excess of those allowed by respondent. On the other hand, we are not fully convinced that petitioner's total gambling losses exceeded his total gains for taxable years 1986 or 1987. Petitioner did enjoy a slight increase in net worth during the years in issue. Also, it is possible that petitioner used some of his gambling winnings for undocumented personal expenses such as food, gas, and clothing. Our duty, then, is to make as close an approximation of the losses as we can, bearing heavily upon the taxpayer whose inexactitude is of his own making. "But to allow nothing at all appears to us inconsistent with saying that something was spent." Cohan v. Commissioner, supra at 544. We therefore find that petitioner is entitled to deduct additional losses in the amount of $ 39,000 in 1986, and $ 26,000 for 1987 against the gambling winnings determined by respondent of $ 46,240 in 1986, and $ 32,571 for 1987. Respondent contends that Schooler v. Commissioner, supra, and Donovan v. Commission, 359 F.2d 64 (1st Cir. 1966), affg. per curiam *146 T.C. Memo 1965-247, compel a decision in his favor. We disagree. The record in this case supports a conclusion that petitioner's losses exceeded any additional amount of winnings that were not included in respondent's statutory notice, and therefore, the losses set out above are allowable as an offset against the winnings determined by respondent in the statutory notice. We are convinced that petitioner sustained greater losses than allowed by respondent and believe this is a proper case for the application of the Cohan rule. The next issue for consideration is whether petitioner is liable for section 6653(a) additions to tax. Petitioner contests the section 6653(a) additions to tax on the sole ground that there is no deficiency for the years at issue. We have concluded that there are deficiencies for 1986 and 1987, albeit not in the precise amounts determined by respondent. Moreover, it is clear from the facts discussed above that petitioner failed to maintain adequate records of his winnings and losses, and that such failure was due to negligence or an intentional disregard of rules and regulations. Therefore, the section 6653(a) additions to tax are *147 sustained, after adjustment to reflect our findings herein. See sec. 1.6001-1(a), Income Tax Regs.; Schroeder v. Commissioner, 40 T.C. 30, 34 (1963). The final issue concerns the addition to tax for substantial understatement of income tax liability under section 6661(a). Petitioner contested the section 6661(a) addition to tax on the sole ground that there is no deficiency for the years in issue. We have concluded that there are deficiencies for the years in issue. Therefore, if the understatements are still substantial (see section 6661(b)(1)(A)), redetermined in the light of our prior holdings, the section 6661(a) addition is sustained and must be recomputed for taxable years 1986 and 1987. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Plus 50 percent of the interest due on the underpayments pursuant to section 6653(a)(1)(B).↩
2. Respondent allowed petitioner a $ 2 loss for each winning pulltab ticket purchased since that was the maximum purchase price permitted under the gaming laws of North Dakota.↩