# United States Tax Court

T.C. Memo. 2024-82

KATHERINE J. KALK,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 2370-18.                    Filed September 4, 2024.

————

Katherine J. Kalk, pro se.

*Alexander S. McCormick*, *Gorica B. Lakic*, *Hannah E. Miller*, *Eugene A. Kornel*, *Alexander R. Roche*, and *Mayer Y. Silber*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*: With respect to petitioner's Federal income tax for 2011–2016, the Internal Revenue Service (IRS or respondent) determined deficiencies of $140,407, $184,493, $37,282, $43,000, $7,804, and $15,039, respectively, plus additions to tax for 2011–2014 and accuracy-related penalties for all six years. *See* §§ 6651(a)(1), 6662(a).[1] The deficiencies are attributable to unreported gambling and other income, disallowed itemized deductions, disallowed business expense deductions, and an additional tax for an early distribution from a retirement plan. *See* § 72(t).

———

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

**[*2]**    Petitioner has conceded that she is taxable on the unreported income, that her claimed itemized deductions were properly disallowed, that she owes the additional tax, and that she is liable for additions to tax on whatever deficiencies we determine. Respondent has conceded that petitioner is not liable for any accuracy-related penalties. The issues remaining for decision are whether petitioner is entitled to deductions allegedly incurred as part of her software consulting and gambling-related activities. We conclude that she has failed to substantiate the business expense deductions, but that she has substantiated gambling losses in excess of those allowed by respondent.

FINDINGS OF FACT

These findings are derived from the parties' pleadings, a Stipulation of Facts with attached Exhibits, a Stipulation of Settled Issues, and the documents and testimony admitted into evidence at trial. Petitioner resided in Indiana when the Petition was timely filed.

I.    *Petitioner's Consulting Activity*

After completing one year of college petitioner began working for a local compressor company. While employed there she gained experience with computer programming. In 2006 she formed her own consulting company that provided software installation and training services. She operated this business—variously called Katie Kalk Consulting and Arisoft Global US, LLC—as a sole proprietorship.

In 2010 petitioner contracted with Performance G2 (PG2) to provide information technology consulting services on a project-by-project basis. PG2 had numerous clients, and petitioner served as a subcontractor for specific clients of PG2. Her contract with PG2 lasted through August 2012.

Under their contract, PG2 would prepare for each project a "statement of work" that detailed the scope, duration, and payment terms. PG2 was required to reimburse petitioner for her travel and other customary business expenses so long as they were reasonable and previously authorized in writing. To the extent petitioner incurred other expenses, she contended that those expenses were built into the hourly rate shown on her invoices to PG2.

During 2011 and 2012 petitioner supplied the bulk of her subcontractor services to Jones Lang LaSalle (JLL), a PG2 client that had 120,000 employees. Her services allegedly included installation of

[*3] software and training employees in its use. But she supplied no statement of work or other document that detailed the services she was expected to perform for JLL. The record includes some of her invoices to PG2, but these simply delineate the hours worked, with no description of the services performed.

Petitioner's services as a subcontractor to JLL constituted the bulk of the work she performed under her contract with PG2 during 2011 and 2012. She became a full-time employee of JLL in August 2012 when her contract with PG2 ended. JLL required her to work onsite at JLL's office in Chicago, Illinois, from 9 a.m. to 2 p.m. Monday through Thursday, and from 9 a.m. to 12 p.m. on Friday. A "go-live issue" connected to software installation could require her in-person attendance at other times. The commute from her home to JLL's office was roughly 67 miles.

JLL required petitioner to work out of its London, England, office for 9 days during February 2011. Petitioner testified that this trip was for "training" and "initial project meetings." Petitioner testified that JLL paid for the airfare but allegedly did not pay for her hotel expenses, meals, or any other costs incurred during the trip.

Petitioner was subcontracted to one other PG2 client, Rewards Network, for one month in Fall 2011. She was required to work onsite at its Chicago office from 8 a.m. to 6 p.m. Monday through Friday. The commute from her home to its office was roughly 65 miles.

Throughout 2011 and 2012 petitioner resided in a two-story, 894-sq.-foot condominium in Indiana. She allegedly turned the lower level bedroom and upper level loft into a home office, and she asserted that "over half of [her work] hours" were performed there. The 120-sq.-foot lower level bedroom allegedly contained three desks, five computers, and two printers, and the 111-sq.-foot upper level loft (adjacent to the master bedroom) allegedly contained a desk, a monitor, a printer, and storage space for office supplies. Petitioner said she incurred substantial expenses to set up the home office and to secure offsite storage of backup "software hardware configurations."

Petitioner contends that she incurred numerous other expenses in her software consulting business, including commuting expenses, vehicle license fees, vehicle insurance, daily parking, and the cost of "working lunches" with "the person she worked for and the developer." These expenses were not reflected in her invoices to PG2, and the only support

[*4] she has supplied consists of various bank statements and a 2012 license renewal receipt.

## II. *Petitioner's Gambling-Related Activity*

In 2011 petitioner allegedly became interested in developing a digital application ("casino app") that would provide casinos with statistical information about their customers' slot machine play. Customers supposedly could also use the casino app to track their daily play and view their wagering history.

Petitioner allegedly performed research in developing the casino app. But the only "research" expenses she reported were ordinary gambling losses that she incurred in playing casino slot machines. She testified that this wagering was necessary to help her understand the "patrons' perspective" and to gain access to the casino's "marketing people."

The record includes "win-loss statements" that the casinos issued petitioner for 2013, 2014, and 2016. Her reported gambling losses for those years exceeded the losses shown on the win-loss statements. She testified that those statements tracked only "casino member card" bets and that she allegedly placed other bets without using her member card. At a time not disclosed by the record, she compiled a 27-page spreadsheet that allegedly showed her slot machine wagering results for each day on which she gambled during 2011–2016.

Petitioner testified that the "casino app" was never developed because she "didn't have data to actually test with." She ceased efforts to develop the "casino app" in August 2012, when she became a full-time employee of JLL and "couldn't devote much time to [development]." However, she continued to report her gambling losses as expenses through tax year 2016.

## III. *Petitioner's Tax Filings*

Petitioner did not timely file a 2011 Form 1040, U.S. Individual Income Tax Return. On May 5, 2016, she filed a delinquent 2011 return. She included with her delinquent return two Schedules C, Profit or Loss From Business. The first Schedule C covered her software consulting activity (Schedule C1). The second covered her "casino app" activity (Schedule C2).

On her Schedule C1 for 2011 petitioner reported consulting income of $296,730, cost of goods sold (COGS) of $143,078, and expenses

[*5] of $153,686, producing a net loss of $34. On her Schedule C2 she reported gambling income of $115,516 and "commissions and fees" of $109,106, producing net income of $6,410. At trial petitioner admitted that the "commissions and fees" reported on her Schedule C2 were actually her alleged gambling losses.

Petitioner likewise filed a delinquent 2012 return. On her Schedule C1 she reported consulting income of $189,225, COGS of $130,910, and expenses of $55,568, producing net income of $2,747. On her Schedule C2 she reported gross receipts of $299,060 and COGS of $297,060, producing net income of $2,000. At trial she admitted that the "COGS" claimed on her Schedule C2 consisted of her alleged gambling losses.

The Schedule C1 and C2 expenses petitioner reported for 2011 and 2012, all of which are in dispute, are as follows:

| Expense | 2011 | 2012 |
|---|---|---|
| Schedule C1 | | |
| COGS | $143,078 | $130,910 |
| Office | 18,393 | 3,000 |
| Rentals | 2,280 | 840 |
| Commissions/Fees | 11,869 | 9,085 |
| Supplies | 15,393 | 2,300 |
| Taxes/Licenses | 16,299 | 16,299 |
| Travel | 74,205 | 18,727 |
| Meals/Entertainment | 8,925 | — |
| Utilities | 3,060 | 3,060 |
| Legal/Professional | 2,500 | — |
| Insurance | — | 1,495 |
| Other | 762 | 762 |
| Schedule C2 | | |
| Commissions/Fees | 109,106 | — |
| COGS | — | 297,060 |

In November 2016 petitioner filed delinquent 2013 and 2014 returns. These returns did not include Schedules C1 because her consulting business ended in 2012. On her 2013 Schedule C2 she reported gambling income of $65,651 and COGS of $137,827, generating a net loss of $72,176. On her 2014 Schedule C2 she reported gambling income of

[*6] $23,944 and COGS of $92,162, generating a net loss of $68,218. At trial petitioner acknowledged that the COGS claimed on her Schedules C2 consisted of her alleged gambling losses.

Petitioner filed timely 2015 and 2016 returns. She did not include a Schedule C with her 2015 return. Her 2016 return included a Schedule C2 for her "casino app" activity. It reported gambling income of $22,000 and COGS of $36,275, generating a loss of $14,275. She admitted that the COGS claimed on her Schedule C2 corresponded to her gambling loss.

On November 1, 2017, the IRS issued petitioner, by certified mail to her last known address, a timely Notice of Deficiency that determined deficiencies, additions to tax, and penalties for 2011–2016 and disallowed, for lack of substantiation, all deductions petitioner had claimed on her Schedules C1 and C2. Petitioner timely petitioned this Court, and we tried the case remotely via Zoomgov on October 30, 2023.

OPINION

I.    *Burden of Proof*

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. *See* Rule 142(a). Section 7491(a) provides that the burden of proof may shift to the Commissioner if the taxpayer "introduces credible evidence with respect to [a relevant] factual issue." But that section applies only if the taxpayer (among other things) "introduces credible evidence" and "has maintained all records required under this title." *See* § 7491(a)(1), (2)(B). Petitioner does not contend, and could not plausibly contend, that section 7491(a) applies to shift the burden of proof.

II.    *Governing Legal Standards*

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). A taxpayer must show that she has met all requirements for each deduction and must keep books or records that substantiate expenses underlying it. § 6001; *Roberts v. Commissioner*, 62 T.C. 834, 836 (1974). Failure to keep and present such records counts heavily against a taxpayer's

**[*7]** attempted proof. *Rogers v. Commissioner*, T.C. Memo. 2014-141, 108 T.C.M. (CCH) 39, 43.[2]

Section 162(a) allows a deduction for "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Whether an expenditure is "ordinary and necessary" is generally a question of fact. *Commissioner v. Heininger*, 320 U.S. 467, 475 (1943). To be "ordinary," the expense must be a common or frequent occurrence for the taxpayer's type of business. *Deputy v. Du Pont*, 308 U.S. 488, 495 (1940). An expenditure is "necessary" if it is "directly connected with" and "appropriate and helpful" to the taxpayer's business. *Welch v. Helvering*, 290 U.S. 111, 113 (1933); Treas. Reg. § 1.162-1(a). No deduction is allowed for "personal, living, or family expenses." § 262(a).

If a taxpayer proves that deductible expenses were incurred but cannot establish the precise amounts, the Court in appropriate circumstances may estimate the deductions allowable. *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930). However, there must be sufficient evidence in the record to supply a rational basis for such an estimate. *Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985); *see Lerch v. Commissioner*, 877 F.2d 624, 627–29 (7th Cir. 1989) (refusing to apply the *Cohan* rule where the taxpayer failed to present evidence to support a reasonable estimate), *aff'g* T.C. Memo. 1987-295.

Section 274(d) sets forth heightened substantiation requirements (and overrides the *Cohan* rule) for certain types of expenses. As in effect during 2011 and 2012, section 274(d) made these strict requirements applicable for "any traveling expense (including meals and lodging while away from home)," "any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity," "any expense for gifts," and "any listed property (as defined in section 280F(d)(4))." "Listed property" was defined to include "any

---

[2] If a taxpayer can establish that she once had adequate records but lost the records because of circumstances beyond her control, such as a fire or other casualty, the Court will permit the taxpayer to reconstruct expenses on some reasonable basis. *See Boyd v. Commissioner*, 122 T.C. 305, 320 (2004); Temp. Treas. Reg. § 1.274-5T(c)(5). Petitioner testified that her laptop computer and business receipts were destroyed in a July 2016 flood. But she supplied no evidence to corroborate this testimony, and we did not find it credible.

[*8] passenger automobile . . . [and] any computer or peripheral equipment." § 280F(d)(4)(A)(i), (iv).

With respect to the items set forth above, section 274(d) provided that no deduction shall be allowed "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statements" the following facts:

> (A) the amount of such expense or other item, (B) the time and place of the travel [or] entertainment . . . or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained . . . or receiving the gift.

*See* Temp. Treas. Reg. § 1.274-5T(c).

For expenses governed by section 274(d), "[w]ritten evidence has considerably more probative value than oral evidence," and "the probative value of written evidence is greater the closer in time it relates to the expenditure." Temp. Treas. Reg. § 1.274-5T(c)(1). Substantiation by "adequate records" generally requires the taxpayer to "maintain an account book, diary, log, statement of expense, trip sheets, or similar record" to document the expenditure. *Id.* subpara. (2). An actual contemporaneous log is not strictly required, but records made at or near the time of the expenditure have greater probative value than records created subsequently. *Id.* subparas. (1) and (2).

III.  *Katie Kalk Consulting—Schedule C1 Business*

Petitioner conducted her Schedule C1 business during 2011 and 2012. For 2011 she reported consulting income of $296,730, COGS of $143,078, and business expenses of $153,686, generating a loss of $34. For 2012 she reported consulting income of $189,225, COGS of $130,910, and business expenses of $55,568, generating a profit of $2,747.

Respondent accepts that petitioner's consulting activities constituted a "trade or business" with the meaning of section 162. However, he contends that petitioner failed to substantiate her reported COGS and her reported expenses, several of which were subject to the strict substantiation requirements of section 274.

**[\*9]**   A.   *COGS*

COGS is an offset subtracted from gross receipts in determining gross income. Treas. Reg. § 1.61-3(a). Technically speaking, COGS is not a "deduction." *See Metra Chem Corp. v. Commissioner*, 88 T.C. 654, 661 (1987). It is the cost of acquiring inventory, either by production or purchase. *Patients Mut. Assistance Collective Corp. v. Commissioner*, 151 T.C. 176, 205 (2018), *aff'd*, 995 F.3d 671 (9th Cir. 2021). Any amount claimed as COGS must be substantiated, and taxpayers are required to maintain records sufficient for this purpose. § 6001; *Nunn v. Commissioner*, T.C. Memo. 2002-250, 84 T.C.M. (CCH) 403, 408; Treas. Reg. § 1.6001-1(a).

During 2011 and 2012 petitioner supplied software consulting services. She served as a subcontractor to PG2, training its clients' employees in the use of new software. Service providers of this sort typically do not incur inventory costs of the magnitude petitioner reported.

Petitioner testified that she incurred COGS in excess of $274,000 during 2011 and 2012 because her duties entailed purchasing computers, computer peripherals, and software for PG2's clients. We did not find that testimony credible. Petitioner did the bulk of her work for JLL, which she described as a multinational company with 120,000 employees. Enterprises of this sort normally acquire computers and software in a centralized manner to ensure compatibility across their entire network. They typically do not delegate to a temporary subcontractor the selection and purchase of software and computers on an ad hoc basis.

In any event petitioner did not supply a shred of documentary evidence to corroborate her testimony. For each project to which she was assigned, PG2 prepared a "statement of work" that detailed the scope of her duties. If her duties included the purchase of computers and software for PG2's clients, the statement of work would surely have so provided. But petitioner did not introduce any "statements of work" into evidence.[3] The record includes some of her invoices to PG2, but they simply list the number of hours worked, with no itemization of expenses.

---

[3] Petitioner testified that she could not provide "statements of work" because they did not exist. We find it implausible that PG2, a company that routinely employed subcontractors on a project-by-project basis, failed to provide documents that outlined each project's scope, duration, and payment terms. Documents of this sort must have existed because petitioner's agreement with PG2 does not delineate her rate of pay.

[*10]  Petitioner testified that her invoices did not itemize her computer acquisition costs because her expenses were "built into her hourly rate." We did not find that testimony plausible.  She negotiated her hourly rate with PG2 at the outset of her engagement.  At that point she could not possibly have known or estimated what computer acquisition costs would be entailed by the projects to which she would ultimately be assigned.

Finally, if petitioner had purchased $274,000 of computers and software for PG2's clients, she would have receipts, credit card statements, bank statements, or other evidence to document those expenditures.  She produced no such evidence at trial.  We will accordingly sustain the disallowance in full of the COGS expenses she reported on her Schedules C1 for 2011 and 2012.

B.  *Section 162 Expenses*

1.  *Legal and Professional Services*

Petitioner deducted $2,500 for legal and professional services for 2011.  She testified that she paid this sum to an attorney who formed Katie Kalk Consulting.  She supplied no evidence that Katie Kalk Consulting was formed in 2011; indeed, the record contains a subcontractor agreement between PG2 and Katie Kalk Consulting dated October 12, 2010.  Nor has petitioner supplied any evidence that she paid any money to any attorney at any time.  We will accordingly sustain the disallowance of this deduction for lack of substantiation.

2.  *Home Office Deduction*

Petitioner deducted $18,393 and $3,000 for 2011 and 2012, respectively, for alleged business use of a home office.  She testified that her 2011 costs were higher because "she had to configure her home office with all sorts of computer equipment and software to enable her to work from home."  She neglected to include with either return a Form 8829, Expenses for Business Use of Your Home, which is used by taxpayers to calculate the allowable expense amount.

The Code generally prohibits deductions for expenses relating to a dwelling unit used by the taxpayer as a residence.  *See* § 280A(a).  Section 280A(c)(1)(A) provides an exception for "any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis . . . as the principal place of business for any trade or business of the taxpayer."  *See Hamacher v. Commissioner*, 94

**[\*11]** T.C. 348, 357 (1990) (stating that "exclusive use" is an "all-or-nothing standard").

A taxpayer may have only one principal place of business. *See Curphey v. Commissioner*, 73 T.C. 766, 776 (1980) (finding that a taxpayer has one principal place of business for each trade or business). To determine the principal place of business, the Court must ascertain the "focal point" of a taxpayer's business activities. *Jackson v. Commissioner*, 76 T.C. 696, 700 (1981). If a taxpayer proves that her residence constituted her "principal place of business," she must also prove what portion of the home was used "exclusively" for that purpose. Otherwise we cannot determine the deductible portion of the relevant expenses. *See Sam Goldberger, Inc. v. Commissioner*, 88 T.C. 1532, 1556–57 (1987).

Petitioner failed to prove that the "focal point" of her software consulting business was her home. She rendered the vast bulk of her services to JLL. At trial she acknowledged that JLL required her to be on site at its Chicago office from 9 a.m. to 2 p.m. Monday through Thursday and from 9 a.m. to 12 p.m. on Friday. She was required to spend longer hours at the office when a software installation was "going live." Her commute to JLL's Chicago location was roughly 130 miles round trip. That being so, it is implausible that her residence could have been the "focal point" of her consulting activities. *See Jackson*, 76 T.C. at 700. She supplied no contemporaneous documentary evidence, in the form of time logs, invoices, or "statements of work," to establish how much time she actually worked from home.

In any event petitioner failed to establish what (if any) portion of her residence was used exclusively for business purposes. She contends that the lower level bedroom housed five computers, three desks, and two printers, and the upper level loft, connected to her master bedroom, was used for business-related storage. But the only evidence she supplied to support this configuration was a diagram she prepared. This diagram, without more, does not establish that "about a third of [her] condo" was exclusively used for business. And the connection between the loft space and her master bedroom, which she described as an "open concept area," leaves us dubious about her "exclusive use" argument.

**[\*12]** *See Hamacher*, 94 T.C. at 357. We will accordingly sustain the disallowance of the claimed home office deductions.[4]

### 3.  *Utilities*

Petitioner deducted $3,060 for utilities for 2011 and 2012—the exact same amount each year. She testified that these expenses were attributable to her home office and included amounts paid for electricity, water, gas, and telephone. Because we have determined that she is entitled to no deduction for a home office, she cannot deduct the cost of utilities to maintain a home office. *See* § 280A(c)(1)(A); Treas. Reg. § 1.262-1(b)(3). In any event she has supplied no credible evidence to establish what her utilities expenses were. The material she supplied—consisting of invoices from AT&T, Comcast, and another company—pertains to a different address and a different tax year. We will accordingly sustain disallowance of these deductions.

### 4.  *Rental Expense*

Petitioner deducted $2,280 and $840 for rental expenses incurred during 2011 and 2012, respectively. Petitioner testified that these expenses were for a storage unit that allegedly held "hardware configurations" for "all of [her] past consulting clients."

By way of evidence petitioner supplied a rental agreement with Michigan Self Storage, dated 2009, with a $75 monthly rental fee. Her bank statements show some charges from Michigan Self Storage (albeit in varying amounts) during 2011 and 2012. But petitioner signed the rental agreement in her personal capacity and supplied no evidence that the storage was used for business purposes in either year. We will accordingly sustain disallowance of these deductions.

### 5.  *Commissions and Fees*

Petitioner deducted $11,869 and $9,085 for "commissions and fees" allegedly incurred in 2011 and 2012, respectively. At trial she testified that she had put these expenses in the "wrong place" and that they actually reflected "loan payments and bank fees." She has supplied no evidence that she incurred such expenses or (if she incurred them) that

---

[4] Petitioner contended that her 2011 deduction was especially high because "she had to configure her home office with all sorts of computer equipment and software." She suppled no documentary evidence to substantiate such purchases. *See infra* p. 13.

[*13] they were deductible under section 162. We will accordingly sustain the disallowance of these expenses.

### 6. *Supplies*

Petitioner deducted $15,393 and $2,300 for supplies allegedly purchased in 2011 and 2012, respectively. She testified that these included "desks, monitors, office equipment, paper, printers, [and] anything that was pertinent to the business itself."

To substantiate her reported expenses petitioner submitted receipts from Staples, Office Depot, and Office Max. All these receipts were dated between 2013 and 2016 and covered (among other things) purchases of SodaStream dispensers and iTunes gift cards. Some of these purchases appear personal and all were made after petitioner had terminated her Schedule C1 consulting business in August 2012.

In a proper case business expenses of this sort may be subject to estimating under the *Cohan* rule. But the Court cannot "simply guess as to the amount [the taxpayer] could have deducted" in the absence of any relevant evidence. *Pfluger v. Commissioner*, 840 F.2d 1379, 1386 (7th Cir. 1988), *aff'g* T.C. Memo. 1986-78. We will accordingly sustain the disallowance of these deductions.

### 7. *Other Expenses*

Petitioner deducted $762 for "other expenses" for 2011 and again for 2012. Petitioner did not address these expenses at trial or in her posttrial brief. We will sustain the disallowance of these deductions.

### C. *Expenses Subject to Section 274*

### 1. *Travel*

For 2011 and 2012 petitioner deducted travel expenses of $74,205 and $18,727, respectively. Petitioner testified that these expenses reflected the costs of her daily commute to Chicago, a two-night stay in Chicago, and a work trip to London.

Taxpayers are generally able to deduct travel expenses (including amounts for meals and lodging) while away from home in the pursuit of a trade or business. § 162(a)(2). But it is well established that the expenses of commuting to and from work are not "ordinary and necessary" business expenses deductible under section 162. *Fausner v.*

[*14] *Commissioner*, 413 U.S. 838, 838–39 (1973); *Commissioner v. Flowers*, 326 U.S. 465, 470 (1946); *Feistman v. Commissioner*, 63 T.C. 129, 134–35 (1974); Treas. Reg. §§ 1.162-2(e), 1.262-1(b)(5). That is because the decision about where to live is typically a personal decision, not a job requirement imposed by one's employer. *Commissioner v. Flowers*, 326 U.S. at 470–74.

We have already determined that petitioner's home office was not her "principal place of business" within the meaning of section 280A(c)(1)(a). The costs she incurred in daily commuting from her home to her jobsite in Chicago were thus personal, nondeductible expenses. *See* Treas. Reg. §§ 1.162-2(e), 1.262-1(b)(5).

Petitioner's bank statements show a hotel stay in Chicago on Friday May 4 and Saturday May 5, 2012. She supplied no plausible evidence that this weekend trip was business related rather than personal. Even if business related, the hotel expense was essentially a substitute for the nondeductible expense of commuting from her home. *Cf. Daly v. Commissioner*, 72 T.C. 190, 196–98 (1979) (denying deduction for overnight lodging expenses in Philadelphia where sales manager commuted weekly to Philadelphia from his home in Virginia), *aff'd*, 662 F.2d 253 (4th Cir. 1981); *Ayria v. Commissioner*, T.C. Memo. 2022-123, 124 T.C.M. (CCH) 379, 381–82 (denying deduction for lodging expenses where taxpayer stayed overnight in Santa Monica, California, rather than commute from Irvine, California).

Petitioner's trip to London is subject to the strict substantiation requirements of section 274(d). She testified that the purpose of the London trip was "to do training" and participate in "initial project meetings." By way of substantiation she supplied a flight itinerary, a Marriott hotel invoice, a Harrods bar receipt, and her bank statements. The flight itinerary was invoiced to JLL and shows a departure date of February 20, 2011, and a return date of February 28, 2011. Petitioner acknowledged that JLL paid for her flight, but she asserted that she paid for the "hotel[s] and food."

To be entitled to such deductions petitioner must show that she was neither reimbursed nor entitled to be reimbursed, by either PG2 or JLL, for the business-related expenses she incurred. *See Orvis v. Commissioner*, 788 F.2d 1406, 1408 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-533; *Leamy v. Commissioner*, 85 T.C. 798, 810 (1985); *Lucas v. Commissioner*, 79 T.C. 1, 7 (1982); *Spielbauer v. Commissioner*, T.C. Memo. 1998-80, 75 T.C.M. (CCH) 1865, 1867. If the taxpayer's employer has a

**[\*15]** reimbursement policy that covers the expenses, the taxpayer must show that she sought reimbursement from the employer. *Orvis v. Commissioner*, 788 F.2d at 1408. The taxpayer bears the burden of proving that she was not entitled to reimbursement. *See Fountain v. Commissioner*, 59 T.C. 696, 708 (1973); *Ayria*, 124 T.C.M. (CCH) at 381.

Petitioner's contract with PG2 included a provision governing reimbursement of "reasonable travel and other customary business expenses." The contract provided that PG2 "will reimburse [petitioner] for any such expenses incurred by [her] upon presentation." Petitioner has failed to establish that PG2 did not reimburse her for the hotel and meal expenses she incurred in London, which the contract seemingly required it to do. In any event where an expense is contractually reimbursable, the taxpayer must establish, as a condition of being allowed a deduction for that item, that she sought and was refused reimbursement. *See, e.g., Fountain*, 59 T.C. at 708; *Spielbauer*, 75 T.C.M. (CCH) at 1867. Because petitioner supplied no evidence on this point, we will sustain the disallowance of her claimed travel expense deductions in toto.

### 2. *Vehicle Expenses*

Petitioner deducted $16,299 for "taxes and licenses" for 2011 and 2012—an identical amount for each year—and deducted $1,495 for 2012 for "insurance." She testified that all of these expenses were vehicle related. She owned two vehicles, one of which she allegedly used solely for commuting to Chicago. She introduced one piece of evidence by way of substantiation—a 2012 receipt from the Indiana Bureau of Motor Vehicles for $158.

Passenger vehicle expenses are subject to the strict substantiation requirements of section 274(d). Because petitioner's principal place of business was in Chicago, her vehicle-related expenses were a component of her commuting expenses, and her 2012 license renewal fee was thus nondeductible. *See* Treas. Reg. §§ 1.162-2(e), 1.262-1(b)(5). Petitioner has submitted no evidence substantiating any other vehicle-related expenses, and we will accordingly sustain the Commissioner's disallowance of those items.

### 3. *Meals and Entertainment*

For 2011 petitioner deducted $8,924 for meal expenses. These expenditures were subject to the strict substantiation requirements of section 274(d). *See* Treas. Reg. § 1.274-2(b)(1)(i). Petitioner testified

**[\*16]** that these expenses were incurred for daily "working lunches" with the "person she worked for and the developer."

By way of substantiation petitioner submitted bank statements, but nothing more. Bank statements alone do not substantiate the "business purpose of the expense" or the "business relationship" between petitioner and the individuals with whom she dined. *See* § 274(d). The cost of eating lunch during the workday is not—without more—a deductible business expense. Because petitioner has failed to substantiate "by adequate records or by sufficient evidence corroborating [her] own statement" that her lunch costs were deductible, we will sustain disallowance of the $8,924 deduction for meal expenses.

IV.  *Schedule C2 Activity*

Petitioner's returns for 2011–2014 and 2016 included Schedules C2 that reported income and expense associated with an activity denominated "Katie Kalk." None of the Schedules C2 identified the nature of this activity. The Schedules C2 reported income and expense as follows:

|  | *2011* | *2012* | *2013* | *2014* | *2016* |
|---|---|---|---|---|---|
| Gross Income | $115,516 | $299,060 | $65,651 | $23,944 | $22,000 |
| Fees/Commissions | 109,106 | — | — | — | — |
| COGS | — | 297,060 | 137,827 | 92,162 | 36,275 |
| Profit/(Loss) | 6,410 | 2,000 | (72,176) | (68,218) | (14,275) |

At trial petitioner testified that her Schedule C2 activity involved efforts to develop a "casino app" for use by casinos and their patrons. There is no evidence that this was a "trade or business" that she conducted with the intent to earn a profit. *See* §§ 162, 183; Treas. Reg. § 1.183-2(b). The "casino app" never advanced beyond a high-level concept phase. The only documentary evidence she submitted consisted of a one-page description of her concept and notes from one conversation with a casino executive. She supplied no evidence of any concrete steps—such as computer programming, software development, or collection of data—toward implementation of this concept.

Petitioner identified no income traceable to her "casino app" activity. Rather, all income reported on the Schedules C2 consisted of ordinary gambling winnings. She likewise identified no expenditures relating to development of a "casino app." The "fees and commissions" reported on her Schedule C2 for 2011, like the "COGS" reported on her Schedules C2 for 2012–2014 and 2016, consisted of alleged gambling

**[\*17]** losses. She testified at trial that she ceased her "casino app" development in August 2012 when she became a full-time employee of JLL. She thus concedes that she had no "casino app" trade or business during 2013, 2014, or 2016, the years for which she reported losses.

Nor does petitioner contend that she was a "full-time gambler" during 2011–2016. *Cf. Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987). She was employed as software consultant during 2011 and 2012, with long commutes to her office in Chicago, and she was a full-time employee of JLL beginning in August 2012. We accordingly find that she had no Schedule C2 business of any kind during the tax years in issue.

Despite the absence of a "trade or business," petitioner is entitled to deduct her gambling losses to the extent of her gambling winnings. *See* § 165(d). In a stipulation of settled issues, the parties have agreed that petitioner had gambling winnings for 2011–2016 that equaled or exceeded the amounts shown on her Schedules C2, as follows:

|  | *2011* | *2012* | *2013* | *2014* | *2015* | *2016* |
|---|---|---|---|---|---|---|
| As reported | $115,516 | $299,060 | $65,651 | $23,944 | -0- | $22,000 |
| As agreed | 135,666 | 330,559 | 66,191 | 34,468 | 10,303 | 22,000 |

Predictably, the parties do not agree about the magnitude of her losses. In practice, not all gamblers keep complete accounts of their gaming wins and losses. In some circumstances, when a taxpayer establishes that she paid or incurred a deductible expense but does not establish its precise amount, we may estimate the amount allowable. *See Cohan v. Commissioner*, 39 F.2d at 543–44. But to do this we must have some basis upon which a reliable estimate can be made. *See Williams v. United States*, 245 F.2d 559, 560 (5th Cir. 1957); *Vanicek*, 85 T.C. at 743. This is a question of substantiation: whether the taxpayer has provided enough evidence for us to estimate, using our best judgment, her gambling losses for the years at issue. *See Coleman v. Commissioner*, T.C. Memo. 2020-146, 120 T.C.M. (CCH) 278, 281; *LaPlante v. Commissioner*, T.C. Memo. 2009-226, 98 T.C.M. (CCH) 305, 308; *Gagliardi v. Commissioner*, T.C. Memo. 2008-10, 95 T.C.M. (CCH) 1044, 1049.

In past cases taxpayers have substantiated gambling losses with such evidence as "casino ATM receipts, canceled checks made payable to casinos, * * * and credit card statements stating that cash was advanced at the casinos." *Coleman*, 120 T.C.M. (CCH) at 281 (quoting

[*18] *Jackson v. Commissioner*, T.C. Memo. 2007-373, 94 T.C.M. (CCH) 611, 611 n.2). We have also considered transactions appearing on a taxpayer's bank statements, the taxpayer's lifestyle (modest or luxurious), and his or her overall financial position. *See Gagliardi*, 95 T.C.M. (CCH) at 1050; *Doffin v. Commissioner*, T.C. Memo. 1991-114, 61 T.C.M. (CCH) 2157, 2162; *cf. Jackson*, 94 T.C.M. (CCH) at 612 (noting the taxpayer's failure to submit the latter forms of evidence).

To substantiate her gambling losses for 2013, 2014, and 2016, petitioner submitted "win-loss statements" from the casinos at which she gambled. She submitted no comparable statements for 2011, 2012, or 2015. The statements for 2013, 2014, and 2016 showed losses of $52,167, $56,134, and $13,494, respectively. We find that she has substantiated losses in those amounts for those years.

Petitioner notes that the win-loss statements tracked her gambling outcomes only when she used her casino member card to sign into the slot machine. She testified that she made many wagers without signing in with her member card, e.g., in the hope of changing her luck or to determine if the slot machine "acted different[ly]." We found her testimony on that point credible.

In an effort to substantiate losses in addition to those shown on the casino win-loss statements, petitioner offered into evidence a 27-page spreadsheet purporting to show her wins, losses, "cash in," and "cash out" on a near-daily basis during 2011–2016. A daily account log, maintained contemporaneously with a taxpayer's gambling activity, and supplemented by verifiable documentation (e.g. bank statements), may suffice in some circumstances to substantiate gaming losses. *See also* Rev. Proc. 77-29, § 3, 1977-2 C.B. 538, 538 (supplying guidelines for substantiating gambling activity). But petitioner's 27-page spreadsheet was not made contemporaneously with her gambling, and she supplied no contemporaneous documentation (such as handwritten notes) to support the entries on the spreadsheet. Petitioner was unable to recall when she compiled this spreadsheet, and we find it insufficient to substantiate the losses shown thereon.

As a backup position petitioner urges that we estimate her gambling losses by considering evidence supplied by her bank statements. We have previously held that relevant evidence may include "casino ATM receipts, canceled checks made payable to casinos, * * * and credit card statements stating that cash was advanced at the casinos."

**[\*19]** *Coleman,* 120 T.C.M. (CCH) at 281 (quoting *Jackson,* 94 T.C.M. (CCH) at 611 n.2).  We will do the same here.

Petitioner's bank statements showed total casino ATM withdrawals for 2011, 2012, 2013, 2015, and 2016 of \$210,229, \$162,199, \$32,536, \$26,193, and \$34,358, respectively.[5]  We find that these withdrawals substantiate losses in those amounts for those years.  *See Coleman,* 120 T.C.M. (CCH) at 281; *see also* Rev. Proc. 77-29.  We conclude that petitioner may deduct her substantiated gambling losses for 2011–2016, up to the amount of her winnings, as provided in section 165(d).

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[5] Petitioner's withdrawals for 2013 do not exceed the aggregate loss reported on her win-loss statement, so she has substantiated no additional loss for that year. As for 2014, we found it unnecessary to compute petitioner's ATM withdrawals because her win-loss statement already substantiated losses in excess of her reported winnings. *See* § 165(d).